(C. D. 1898)

NORTH AMERICAN SMELTING CO. v. UNITED STATES

United States Customs Court, Second Division

(Decided July 16, 1957)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Henry J. O'Neill*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: The instant protest relates to an importation of 1,352 ingots of so-called mixed tin, which the parties have stipulated to be an alloy in chief value of tin. This merchandise was classified by the collector of customs at the port of entry as solder, and, accordingly, was assessed with duty at the rate of $1\frac{1}{16}$ cents per pound on its lead content, pursuant to the provisions of paragraph 392 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739.

In its protest, plaintiff claimed that said merchandise was properly free of duty, either by virtue of the provision in paragraph 1786 of said act for alloys in chief value of tin, not specially provided for, or by reason of the provisions of Public Law 535 of the 82d Congress. Inasmuch, however, as no evidence was adduced in support of the latter claim, nor argument made to advance it, we deem the same to have been abandoned and treat this action as one involving only a competition between said paragraph 392, as modified, and said paragraph 1786. These provisions read as follows:

Paragraph 392, as modified, *supra*:

Lead bullion or base bullion, lead in pigs and bars, lead dross, reclaimed lead, scrap lead, antimonial lead, antimonial scrap lead, type metal, Babbitt metal, solder, all alloys or combinations of lead not specially provided for_____1⅛/₁₆¢ per lb. on lead content

Paragraph 1786:

Tin in bars, blocks or pigs, alloys in chief value of tin not specially provided for, and grain or granulated and scrap tin, including scrap tin plate.

A sample of the instant importation was analyzed by the United States Customs Laboratory and reported to contain 46.63 percent lead, 0.04 percent antimony, 0.07 percent copper, and, by difference, 53.26 percent tin (defendant's exhibit B). Present also in the sample, as revealed by spectographic examination and included in the analysis under tin, were 0.075 percent bismuth, 0.004 percent silver, 0.001 percent iron, and a trace of indium.

It appears from the record that the merchandise at bar was purchased by the plaintiff from the firm of Montanore, Inc., an importer and exporter of nonferrous metals in various shapes and forms, pursuant to a contract (plaintiff's exhibit 1), containing the following specifications:

Twenty-Five (25) Metric Tons Mixed Tin in Ingot Form analysing as follows:

| 55–60% Sn | [tin] [1] | Maximum Antimony allowed ½% |
|---|---|---|
| .30% Sb | [antimony] | Maximum Copper allowed ⅒% |
| .10% Cu | [copper] | All in excess to be deducted in full |
| .01% As | [arsenic] | from tin. |
| .01% Fe | [iron] | |
| Balance Pb | [lead] | |
| Free of Zinc and Aluminum | | |

Price: Full tin content at $1.20 per lb. plus full lead content at 14¢ per lb. less smelting charge of 2¼¢ per lb. of material. Duty, if any, for seller's account. C. I. F. Philadelphia

[1] Matter in brackets supplied

The contract between Montanore, Inc., and its foreign supplier is in evidence as plaintiff's exhibit 2.

Concerning plaintiff's exhibit 1, Richard L. Sommer, president of Montanore, Inc., testified on behalf of plaintiff that the prices

therein specified for tin and lead were the market prices for :those commodities and that the allowance of 2¼ cents per pound of material was supposed to cover the refining charge. He also stated that merchandise of this character, in ingot form, was usually sold in this country wherever there are secondary smelters that can refine it into solder.

The principal witness for the plaintiff was its buyer, Conrad Maxmin, whose duties include the purchase of all the nonferrous metal scrap, and raw material consumed by plaintiff in its smelting operations, as well as some selling and production activities. He testified that the contract of purchase of the instant merchandise did not contain exact specifications of tin content, for the reason that the supplier does not usually have an analysis before him at the time of sale, but an approximation is necessary to govern his company's tin position; that specifications as to size, weight, and marking of ingots were omitted, because this merchandise was purchased as raw material or scrap, and not as a finished product; and that the smelting charge reduction of 2¼ cents per pound was to defray the cost of realloying and further processing to produce a finished product.

To the best of Maxmin's recollection, an analysis of the merchandise by his company, the report of which had been mislaid, revealed an average tin content of 54.37 percent. He further stated that the ingots were marked in red paint with the initials "ZW" and weighed approximately 41 pounds each. After sampling, the material was put in the company's scrap position and consumed in its melting processes.

According to this witness, the material could not be resold in its imported condition, but had to be realloyed and recast in one shape or another for sale as solder to manufacturers of automobiles, radiators, and air-conditioning units, plumbing supply houses, and other consumers of solder metal. He stated that, when solder is purchased by the Federal Government, or by customers having contracts therewith, it must conform to specifications approved by the Bureau of Federal Supply, which are authoritative in the solder industry. The specifications for solder are listed in a publication numbered QQ-S-571b, effective September 30, 1947, received in evidence as plaintiff's exhibit 3. Tin composition and ranges are therein given as follows:

| Composition | Tin (range) |
| --- | --- |
| Sn 70 | 69.5 to 71.5 |
| Sn 60 | 59.5 to 61.5 |
| Sn 50 | 49.5 to 51.5 |
| Sn 40 | 39.5 to 41.5 |
| Sn 35 | 34.5 to 36.5 |
| Sn 30 | 29.5 to 31.5 |
| Sn 20 | 19.5 to 21.5 |

Maxmin testified that the imported merchandise did not fall within the foregoing specifications, for the reason that it had higher tin than the 50-tin specification and lower tin than the 60-tin specification, and it is not permissible to exceed the maximum or be less than the minimum of any of the tin specified. Moreover, the importation did not comply with the marking specifications, which require that bars or ingots shall have cast or stamped thereon the composition designations and the contractor's brand or initials. In fulfilling Government contracts, any specifications given must be rigidly observed.

The witness further stated that North American Smelting Co. sells solder in spools, weighing 1 pound, 5 pounds, and 25 pounds, which is wire solder; in cakes of 2½- and 5-pound weights; in 9- and 14-pound bars; in pigs, weighing 20, 30, 35, 40, 50, and 75 pounds; and as chopped-up wire in very small pieces; and that a 41-pound weight would be unusual, as specifications are normally for the nearest 10- or 20-pound weight. Customers, in ordering, generally set forth the form and size necessary for their production and handling requirements. Every bit of solder sold by plaintiff has its name, a brand name, or a supplier's name on it, and most of the time the specification number requested by the customer. "We have to give the customer what he asks for, yes. We must mark it in accordance with his request, etc." This is the case also with most of the large producers who have their own brands and markings. In normal practice, the imported ingots could not have been sold as a good delivery of solder.

On cross-examination, Maxmin testified that tin-lead solder is sold under many other specifications than those set out in exhibit 3; that, although it would be unusual to find a specification calling for a tin content of 53.73 percent, if a product had the proper proportions of lead and impurities within the permitted degrees, it would still be regarded as solder tin-lead; and that, to the best of his knowledge, ingots, such as those here involved, are marketable only to secondary smelters like plaintiff. He agreed that solder is an alloy of two or more metals used for joining other metals together by surface adhesion, the requirement being that it have a lower melting point than the metals being joined and that the higher the tin content, the better the quality of solder.

This witness identified a specification handbook as one issued by his company, and pages 89 to 95 thereof, relating to solder, were received in evidence as defendant's exhibit A. He thereupon testified as follows:

By Mr. O'Neill:

X Q. Assuming a prospective purchaser came to your sales organization and told them that he wanted to buy 50,000 pounds of solder in bars or sticks of a specified size, and named as his irrevocable specifications for the component ingredients thereof the following: lead 46.63; tin 53.18, and not more than antimony 0.04; copper 0.07, bismuth 0.075; silver 0.004; iron 0.001, and if any, a

faint trace of indium, and assuming further that the ingots under consideration in this case contained component ingredients of the kind and in the percentages just named by me, could not your company accept and fill that prospective customer's order by simply melting those ingots and casting the molten metals according to his bar or stick specifications?

\*     \*     \*     \*     \*     \*     \*

THE WITNESS: In reference to the analysis you gave, you did not show any leeway as to the tin and lead. We don't take an order at a 53.18 tin. There has to be some leeway. To that extent we could make it if there is a leeway.

By MR. O'NEILL:

X Q. On direct testimony you stated you gave the customer what he wanted. Here is a customer who comes in and states those specifications, and I am asking if it isn't a fact that you could accept and fulfill his order by simply melting the ingots, casting the molten metals according to his bar or stick specifications?—A. It is extremely doubtful if that could be done simply by melting the ingot that way.

X Q. You mean it is impossible with the use of heat to not reduce this beyond its melting point and up to a flowing point and then cast it?—A. You asked if we could do it in our operation, and that is why I pointed out if there is commercial tolerance for the tin and lead we could, but to hold it to one-hundredths of one per cent of tin and lead, and one-thousandths of one per cent on the impurities, nobody in the solder business can do it, because you melt it in pots where there might be a slight impurity pick-up of some of your tin. That is why there is a commercial tolerance. Even in your Federal specifications you are permitted one-half below to one and one-half above.

X Q. If your purchaser insisted on your going ahead, and was willing to accept what remained after whatever operation you took to give him what he wanted, would he still not have lead tin solder?—A. It is still lead tin solder.

On redirect examination, the witness stated that it would be almost an impossibility for a customer to give such an order; that regular commercial tin-lead solders have the following compositions: 10 tin, 90 lead; 15 tin, 85 lead; 20 tin, 80 lead; 25 tin, 75 lead; 30 tin, 70 lead; 40 tin, 60 lead; 50 tin, 50 lead; 60 tin, 40 lead; and, occasionally, 65 tin, 35 lead; and, while there used to be a 55-tin, 45-lead combination, that is rare today. Questioned further on re-cross-examination, this witness testified as follows:

R.X Q. Taking ingots, and for the present purposes of my question, assume that the imported ingots contain these percentages of ingredients.—A. I follow you now.

R.X Q. That they were made up of lead 46.63 per cent; tin 53.18 per cent, and not more than antimony 0.04 per cent; copper 0.07 per cent; bismuth 0.075 per cent; silver 0.004 per cent; iron 0.001 per cent, and if any, a faint trace of indium, and you reduced those ingots to bars and sticks, I am asking you could not that solder be used for general use purposes and tinsmith purposes?—A. Yes.

R.X Q. It could be?—A. Yes, sir.

For the defendant, Joseph Lamb, the assistant chief chemist at Philadelphia, testified concerning the constituents hereinabove set forth of a sample of the imported product and admitted that, whereas the laboratory report (defendant's exhibit B) made reference to

Federal Specification QQ–S–571, he knew that later specifications had been issued.

Predicated upon various lexicographical definitions of the word "solder," holding generally to the effect that it is a metal or metallic alloy *used* when melted to join other metallic surfaces, counsel for plaintiff contends that the merchandise at bar is excluded from the scope of that term. It is argued that, in its imported form and composition, the alloy in issue is not susceptible of use in joining other metallic substances; that it is not, in its imported condition, commercially salable as solder; and that it is, in fact, merely a raw material used in the manufacture of solder. In substance, plaintiff's position is that the involved ingots are solder material rather than solder and, hence, not embraced within the provision for solder in said paragraph 392, as modified.

Since there is no question here of commercial designation, and it is, in fact, conceded that the common meaning of the term "solder" controls, we regard it as immaterial, though established by the evidence, that the merchandise at bar is not a typical commercial solder, nor ordinarily used in its imported condition for soldering purposes. Whether its relative proportions of tin and lead conform to Federal specifications, or to the usual requirements of other consumers of solder metal, the fact, nevertheless, remains, as admitted by plaintiff's witness Maxmin, that this material is "still lead tin solder," which could be used "for general use purposes and tinsmith purposes." That it is not generally so used does not presuppose an incapability of such use. As solder is supplied to buyers, in accordance with furnished specifications of size, form, weight, and component materials to suit their individual needs, no combination of a tin-lead alloy, having properties appropriate to effect, by melting, the joining of other metal, would appear to be excluded from description as "solder."

Moreover, this is not a case of initial impression. Merchandise of substantially identical character to that here involved, being composed of 46.3 percent lead, 0.5 percent antimony, remainder tin, was the subject of judicial scrutiny in the case of *United States* v. *Ayrton Metal Co., Inc.*, 30 C. C. P. A. (Customs) 94, C. A. D. 221, and therein held to be solder, as provided for in said paragraph 392, as against a claim for classification within paragraph 1786, *supra*, as alloys in chief value of tin. The court, in arriving at that conclusion, considered as "very pertinent here as an aid in determining what solder is," though "not necessarily controlling in customs procedure," Federal specifications for tin-lead solder, issued May 31, 1932, under number QQ-S-571, wherein was listed a tin-lead solder with a minimum tin content of 30 percent and a tin plus lead minimum of 97.50

percent. While specification QQ-S-571 has since been superseded, and specification QQ-S-571b (plaintiff's exhibit 3), the current issue, differs radically from it, as hereinabove indicated, we do not consider this circumstance as requiring a departure from the holding in the cited case. The Federal specifications were but one of the elements entering into the court's finding that "the clear weight of the evidence establishes the fact that the merchandise in its imported condition was solder in the sense of that term as used in paragraph 392 of the Tariff Act of 1930." It also considered, as significant, testimony of two Government witnesses, to the effect that metal of the type there involved was, in their opinion, solder.

Whereas it appeared in the cited case that the Federal specifications covered all commercial grades of solder which were sold, the instant record clearly reveals that tin-lead solder is sold under many specifications, other than those prescribed in QQ-S-571b. As to such other grades, it is here shown that what the customer specifies is what the smelter supplies, and were the customer to request an alloy having the same constituents as those present in the merchandise at bar, in its imported condition, he would receive lead-tin solder.

Upon the foregoing considerations, we hold the instant merchandise to be solder within the contemplation of paragraph 392, as modified, *supra*, dutiable, as assessed, at the rate of $1\frac{1}{16}$ cents per pound of lead content. All claims in the protest are, therefore, overruled.

Judgment will be entered accordingly.