(C.D. 2121)

Victoria Gin Co., Inc.
W. H. Morton
} *v.* United States

United States Customs Court, First Division

(Decided October 2, 1959)

*Sharretts, Paley & Carter (Joseph F. Donohue* of counsel) for the plaintiffs.
*George Cochran Doub,* Assistant Attorney General (*Murray Sklaroff,* trial attorney), for the defendant.

Before Oliver, Mollison, and Wilson, Judges; Oliver, C. J., dissenting

Mollison, Judge:   The plaintiffs in this case imported in one shipment two carloads of a material which they entered free of duty under

the provisions of paragraph 1719, Tariff Act of 1930. Said paragraph reads as follows:

PAR. 1719. Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for.

On liquidation of the entry, the collector of customs classified the merchandise as crude barytes ore and assessed duty thereon at the rate of $2.85 per ton under the provisions of paragraph 67 of the Tariff Act of 1930, as modified by T.D. 54108, for barytes ore, crude or unmanufactured. The protest claim is for free entry under paragraph 1719, *supra*.

At the trial of the issue, there was offered and received in evidence without objection as plaintiffs' exhibit 1 a laboratory report signed by three United States Customs chemists from which it appears that the barium sulphate content by weight of one carload of the involved importation was 84.8 per centum, and of the other 85.1 per centum.

The plaintiffs' claim is based upon the contention that, at the time of the enactment of the Tariff Act of 1930, the tariff term, "barytes ore, crude," or its more usual form, "crude barytes ore," as used in the trade and commerce of the United States dealing in such commodity, had reference to and included only a material containing 90 per centum or more of barium sulphate and used in the manufacture of lithopone, ground barytes, and barium chemicals.

It is the defendant's contention that the tariff term was not so limited and that the imported material is a form of crude barytes ore.

At the outset, several points as to which there seems to be no real question between the parties may be stated. First, there is no contention on the part of either of the parties that the commercial meaning of the tariff term, "barytes ore, crude," differed from the common meaning thereof. Consequently, no issue involving the rule of commercial designation is raised in this case. Second, in view of the classification of the collector and the claim of the plaintiffs, the parties are in apparent agreement that the imported material was in a crude state. Third, the term "barytes ore, crude," is *eo nomine* designation.

To the foregoing, there may be added certain well-settled principles of law which have application in the disposition of the issue in this case. First, tariff acts are construed according to the commercial understanding of the terms employed, which is presumed to be the same as the common understanding thereof. *Swan* v. *Arthur*, 103 U.S. 597, 598; 26 L. ed. 525, 526. Second, the commercial and common meaning of an *eo nomine* designation in a tariff act must be determined as of the date of the enactment of the act. *Smillie & Co.* v. *United States*, 12 Ct. Cust. Appls. 365, T.D. 40520, and *United States* v. *O. Brager-Larsen*, 36 C.C.P.A. (Customs) 1, C.A.D. 388. Third, the common meaning of tariff terms is within the judicial knowledge, and

matter of law. *Sonn* v. *Magone*, 159 U.S. 417; 40 L. ed. 203. Fourth, the court may invoke, but is not bound by, such aids to its understanding of the term as dictionaries, lexicons, written authorities, and the testimony of witnesses. *United States* v. *May Department Stores Co.*, 16 Ct. Cust. Appls. 353, 355, 356, T.D. 43090.

Of course, it is also well understood that all of the foregoing principles are subject to the exception that they are not operative in the face of contrary legislative intent. However, no such contrary legislative intent appears to be involved in the case at bar.

Both plaintiffs and defendant offered the testimony of witnesses who had considerable experience, prior to the enactment of the Tariff Act of 1930, with the purchase, sale, or use, in a commercial way, of crude barytes ore. While it was established thereby that, prior to that time, the *principal* commercial uses for crude barytes ore were (1) in the manufacture of lithopone, (2) the preparation of ground barytes, and (3) the production of barium chemicals, the record does not show that there were any other uses for crude barytes ore at that time. Apparently, there were none, as is indicated by the statement found in the Summary of Tariff Information, 1929, compiled by the United States Tariff Commission and printed for the Committee on Ways and Means of the House of Representatives when the the revision or readjustment of the Tariff Act of 1922 was under consideration, as follows (p. 327) :

\* \* \* Of the 276,056 short tons of barytes ore consumed in the United States in 1926, 178,889 tons were used in the manufacture of lithopone (see par. 79), 64,048 tons for ground barytes, and 33,119 tons for barium chemicals (see par. 12).

It will be seen that the above breakdown adds up to 276,056 tons.

It appears to be without dispute that crude barytes ore was, at and prior to the enactment of the Tariff Act of 1930, always sold upon specification of the barium sulphate content of the ore, and, while there is some dispute as to (1) the minimum barium sulphate content called for by the specifications of individual buyers and (2) the effect of delivery below the minimum specifications, we think it is clear that the *lowest* minimum specification of barium sulphate content (in the experience of defendant's witness) was 92 per centum. In the case of plaintiffs' witnesses, the specifications were 93 per centum or higher, depending upon the use for which the crude barytes ore was purchased.

It appears from the testimonial record that the minimum specifications were all-important in view of the fact that, at the time of the enactment of the Tariff Act of 1930, the three purposes for which crude barytes ore was commercially used required a product comparatively free of impurities, difficult to remove, and the process for the removal

of which caused losses in recovery of the desired product, and made it unfeasible from a commercial standpoint to use ores containing below 90 per centum of barium sulphate.

Thus, it appears that it was the experience of defendant's witness in connection with the plant of which he was in charge which made lithopone from crude barytes ore that at all times the plant sought a barium sulphate content of 92 per centum and higher. It appears that the plant would accept ore having a lesser percentage of barium sulphate, with a penalty upon the seller for each one-tenth of 1 per centum under 92 per centum. The witness stated that "there was very little used below 90 per cent," and, although he remembered *one* lot of several hundred tons of domestic material which ran 85 per centum, this, it appears, was an exception to the rule.

The single lot just mentioned was received in the wartime period of 1917–1918, when the supply of barytes ore from abroad had been cut off and the barytes industry in this country was beginning to rise. No other instance was given of material of such low barium sulphate content having been received or used between that time and the period at and prior to the enactment of the Tariff Act of 1930, and it therefore appears that the single shipment mentioned was not in any way indicative of what constituted barytes ore at the time of the passage of the Tariff Act of 1930.

The testimony as to the 90 per centum minimum content of barium sulphate is corroborated by all of the written authorities on the subject which the court has been able to consult.

The Summary of Tariff Information, 1929, already cited, states (p. 327):

* * * The commercial grades of crude barytes contain 90 to 95 per cent of barium sulphate.

The Condensed Chemical Dictionary, 1930, 1942 (Reinhold, New York):

barytes * * *

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

* * * Commercial grades of the crude product contain from 90 to 95% $BaSO_4$.

Chemicals of Commerce, by Snell and Snell, 1939 (Van Nostrand, New York):

Barium sulfate, $BaSO_4$, occurs naturally as barytes, barite, or heavy spar. The natural mineral may contain up to 5 or even 10 per cent of impurities. * * *

Nonmetallic Minerals, by Ladoo and Myers, 1951 (McGraw-Hill, New York), at page 67:

BARITE

Composition. Barite, also commonly known as barytes and heavy spar, has the formula $BaSO_4$, its composition being BaO, 65.7 per cent; and $SO_3$, 34.3 per cent.

Commercial forms of barite may run as low as 92 per cent BaSO₄ with impurities consisting of silica, iron oxide, limestone, dolomite, shale, etc.

at page 75:

* * * Commercial crude barite should contain not less than 93 per cent barite; the better grades contain 95 to 98 per cent barite and 1 to 3 per cent silica.

Barite and Barium Products, United States Department of Commerce Information Circular No. 6221, January 1930 (p. 3):

Commercial crude barite should carry more than 93 per cent barium sulphate; the better grades of domestic barite carry at least 95 per cent. Ore running less than 90 per cent barium sulphate is not commonly acceptable to the lithopone and barium chemical manufacturers, who specify also a low maximum content of iron and other impurities. Certain of the users of crude barite impose penalties of so much per unit for each percentage below a stipulated grade.

This last reference was supplied by counsel for the plaintiffs, and counsel for the defendant points out that in the same information circular, under the general heading of "Mining Methods" and the specific heading of "Power Shovel Mining," the following excerpt is found:

With the present cost of operation in the Georgia and Tennessee fields, an ore yielding 5 per cent BaSO₄ is the lowest grade workable. The average deposits mined probably range between 12 and 20 percent, and in some places 40 per cent ore has been mined. * * *

Counsel for the defendant contends that the foregoing "is in complete harmony with the position of defendant," i.e., that the term "barytes ore, crude," was not limited to an ore having a barium sulphate content of 90 per centum or more.

We think it is apparent, however, from a reading of the associated material found in the circular, as well as from a perusal of the testimony adduced at the hearing, that what is called "ore" in the foregoing excerpt is all of the material in the barytes deposit as it comes from the ground. The record shows that barytes occurs in deposits of what one witness called "barytes earth," which may have the barium sulphate content indicated in the excerpt. The barytes earth is not the crude barytes ore of commerce, however, the record showing that the latter is the barytes earth after it has been washed, jigged, and tabled, or "beneficiated," to remove the foreign material, such as mud or gangue.

We conclude from our own research and from a perusal of the aids to our understanding offered by the parties that, at the time of the enactment of the Tariff Act of 1930, the material known to commerce as "barytes ore, crude," or crude barytes ore was one which contained 90 per centum or more of barium sulphate. Inasmuch as tariff acts are written in the language of commerce, this was the material which

Congress had in mind when it provided *eo nomine* in paragraph 67, *supra*, for "barytes ore, crude."

It appears from matters brought out in the testimonial record and from a perusal of some of the authorities on the subject that some time after the enactment of the Tariff Act of 1930 there was developed a use for ground barytes which such material did not have in 1930 and prior thereto, to wit, to be added to the mud used in the drilling of oil wells to balance the weight of the tools used and to promote safety by preventing blowouts. For this purpose, it appears that ground barytes may be prepared with the use of an ore of lower specification as to barium sulphate content than that which was required at the time of the enactment of the Tariff Act of 1930 and prior thereto for the then known uses of crude barytes ore.

Thus, it appears that since the enactment of the Tariff Act of 1930 the meaning of the *eo nomine* term "barytes ore, crude," or crude barytes ore has been changed or enlarged to include a material which theretofore was not within the common and commercial understanding or acceptation of the term, and, although the record is not precisely clear on the point, we assume that the material at bar is within the present-day common and commercial meaning of the term "barytes ore, crude," or crude barytes ore.

The issue presented, therefore, is, which of the two meanings of the *eo nomine* term—that which obtained at and prior to the enactment of the Tariff Act of 1930, or that which developed after that time— is to be applied.

The law on the point has recently been made very clear by the decision of our appellate court in the case of *Davies Turner & Co.* v. *United States*, 45 C.C.P.A. (Customs) 39, C.A.D. 669, the facts and law in which are analogous to those in the case at bar.

There, as here, the meaning an *eo nomine* tariff term had at the time of the enactment of the Tariff Act of 1930 had subsequently changed or enlarged to include merchandise not theretofore included in such meaning. It was held that the term must be held to include only that merchandise which was within the meaning the term had at the time of the enactment of the tariff act, the majority of the court saying:

> * * * the meaning of words used in such acts is fixed at the time of enactment *and does not fluctuate as the meaning of words might subsequently vary.* [Italics added.]

The majority of the court pointed out, however, that if merchandise not known to commerce at the time of the enactment of a tariff act should, after the enactment of the act, become known to commerce, *and if such merchandise should be found to be within the meaning a tariff term had at the time of the enactment of the tariff act*, the tariff term would be held applicable to it.

The necessary corollary, and the one applied in that case, is that if such merchandise should be found *not* to be within the meaning the term had at the time of the enactment of the tariff act, the tariff term would not apply to it.

Defendant points out in the brief filed in its behalf that there is no showing in the case at bar "that barytes ore of less than 90 per cent barium sulphate was not known," and consequently argues that the rule of the *Davies Turner* case does not apply here. We think that argument overlooks the fact that the full expression involved is not "not known" but "not known to commerce." What the trade and commerce of the United States knew and dealt in *as crude barytes ore* was material having a barium sulphate content of 90 per centum or more. What Congress was enacting a tariff duty upon was the material known to and dealt in by commerce *as crude barytes ore*. In that sense, material having a barium sulphate content of less than 90 per centum was not known to commerce *as crude barytes ore*. Commerce might have been aware of its existence, but did not recognize or accept it as the crude barytes ore in which it dealt.

The rule of the *Davies Turner* case is that merchandise is embraced by an *eo nomine* tariff term only if it is within the meaning the term had at the time of the enactment of the tariff act in which the term appears. And this is so no matter when the merchandise became known to commerce, whether before or after the enactment of the act.

Counsel for the defendant has cited as analogous on its facts the decision of this court in the case of *C. J. Tower & Sons* v. *United States*, 42 Cust. Ct. 25, C.D. 2062. That case involved the dutiable status of a product bearing the trade name "Lioxin," composed of 96–97 per centum of vanillin and the remainder of impurities, which had been assessed with duty under the *eo nomine* provision in paragraph 28(a) of the Tariff Act of 1930, as amended, for "Vanillin, from whatever source obtained, derived, or manufactured." It was claimed in that case, among other things, that the commercial meaning of the term "vanillin" differed from the common meaning therefor, in that the commercial meaning referred only to that product meeting U.S.P. specifications, which Lioxin did not. It appeared from the record in that case that there were two grades of vanillin on the market, U.S.P. and technical, and that Lioxin was a technical grade of vanillin. It was held that the plaintiff had failed to establish a commercial meaning of the term "vanillin" different from the common meaning therefor, and that Lioxin was within the common and commercial meaning of the term.

We do not think that either the factual or legal situation in the *Tower* case, *supra*, is analogous to that in the case at bar, or that the decision in that case is in any way controlling of the issue herein. There is no issue of commercial designation in the case at bar and the

record and authorities indicate that the only product marketed at the time of the passage of the Tariff Act of 1930 as crude barytes ore was one which contained 90 per centum or more barium sulphate.

Defendant also cites as dispositive of the issue the decision of this court in the case of *North American Smelting Co.* v. *United States*, 39 Cust. Ct. 25, C.D. 1898, involving an importation of certain tin-lead alloys, classified by the collector under the *eo nomine* designation "solder" in paragraph 392, Tariff Act of 1930. It was shown in that case that there existed certain Federal specifications governing the tin-lead ratio in solder purchased by the Federal Government or by customers having contracts therewith, and that regular commercial solders had similar tin-lead ratio specifications. The imported merchandise, although having a ratio of tin to lead within the extremes of the specifications, did not have any specific tin-lead ratio called for either in the Federal specifications or those governing regular commercial solders, and, in holding that that fact did not exclude it from the tariff provision for "solder," the court said (as quoted in defendant's brief) :

Since there is no question here of commercial designation, and it is, in fact, conceded that the common meaning of the term "solder" controls, we regard it as immaterial, though established by the evidence, that the merchandise at bar is not a typical commercial solder, nor ordinarily used in its imported condition for soldering purposes.

Counsel for the defendant argues that "this is the theme of the instant protest and the *Tower* case, *supra*, with just a slight modification." We think the above sentence cannot be quoted out of context with those which follow it and explain the action of the court. After stating the above, the court went on to say :

\* \* \* Whether its relative proportions of tin and lead conform to Federal specification, or to the usual requirements of other consumers of solder metal, *the fact, nevertheless, remains, as admitted by plaintiff's witness Maxmin, that this material is "still lead tin solder," which could be used "for general use purposes and tinsmith purposes." That it is not generally so used does not presuppose an incapability of such use. As solder is supplied to buyers, in accordance with furnished specifications of size, form, weight, and component materials to suit their individual needs, no combination of a tin-lead alloy, having properties appropriate to effect, by melting, the joining of another metal, would appear to be excluded from description as "solder."* [Italics added.]

No comparable facts appear in the case at bar. There, the evidence showed that the merchandise could be used for *the same purposes* as solder having the tin-lead ratios of the Federal and commercial specifications, whereas, in the case at bar, the record shows that ore containing less than 90 per centum barium sulphate was not practically and commercially used or usable for the purposes for which crude barytes ore was used at the time of the enactment of the Tariff Act of 1930.

We think the case which best demonstrates the point which must

be made in this case is *Chicago Mica Co. et al.* v. *United States*, 21 C.C.P.A. (Customs) 401, T.D. 46927. That case involved a shipment of screened scrap mica imported in 1929 and 1930, while the Tariff Act of 1922 was in force. At the time of the enactment of the Tariff Act of 1922, such scrap mica had little or no practical use or value and was not sold because there was no demand for it. After the enactment of the Tariff Act of 1922, however, and in 1926 or 1927, there was invented a splitting machine with the use of which scrap mica became merchantable and usable for some of the same purposes as the merchandise answering the description of the tariff term "mica, unmanufactured," as used in the Tariff Act of 1922.

The merchandise was classified under the provision for "mica, unmanufactured," and was claimed to be entitled to a lower rate of duty as waste, not specially provided for.

The court determined that the merchandise was properly classifiable under the provision for mica, unmanufactured, rather than under the provision for waste. It will be seen, however, that, in the *Chicago Mica Co.* case, the facts are *vitally different* from those in the case at bar, but the difference points up the precise situation involved. The difference may be summarized as follows:

In the *Chicago Mica Co.* case, the invention of a machine after the enactment of the Tariff Act of 1922 conferred upon scrap mica, which theretofore was of little or no value or use, the *same* merchantability and use which merchandise embraced by the tariff term "mica, unmanufactured," had at the time of the enactment of the Tariff Act of 1922. In other words, a new status and use had been conferred upon scrap mica which brought it within the meaning the tariff term "mica, unmanufactured," had at the time of the enactment of the tariff act in which that term appeared.

In the case at bar, the development of a new use after the enactment of the Tariff Act of 1930 conferred upon ore containing less than 90 per centum barium sulphate, which theretofore was of little or no value or use, a merchantability and use *different from* those which merchandise embraced by the tariff term "barytes ore, crude," had at the time of the enactment of the Tariff Act of 1930. In other words, the new status and use which had been conferred upon ore containing less than 90 per centum barium sulphate *did not bring it within the meaning the tariff term "barytes ore, crude," had at the time of the enactment of the tariff act in which that term appears.*

In view of the clear holding of the *Davies Turner & Co.* case that the meaning which a tariff term had at the time of the enactment of the tariff act in which it appears does not fluctuate, it must follow that the tariff term "barytes ore, crude," does not embrace merchandise which does not respond to the meaning the term had at the time of the enactment of the Tariff Act of 1930.

The situation in this case is that, at the time of the enactment of the Tariff Act of 1930, the *eo nomine* tariff term "barytes ore, crude," or crude barytes ore, embraced only such ore as had a barium sulphate content of 90 per centum or more. The two carloads of the merchandise involved in this case are shown to have had a barium sulphate content of 84.8 and 85.1 per centum. They are, therefore, not within the common and commercial meaning of the tariff term involved, and not dutiable under paragraph 67.

There does not seem to be any question but that if the merchandise at bar is not crude barytes ore, it is, nevertheless, a crude mineral, and there being no more specific provision therefor in the tariff act, it accordingly takes classification under the provision in paragraph 1719 for crude minerals, not specially provided for, as claimed.

Judgment will issue accordingly.

### DISSENTING OPINION

Oliver, Chief Judge: I respectfully dissent from the decision of my learned colleagues in this case. It is my opinion that the record herein will not support the statement in the majority opinion that "the facts and law" in the case of *Davies Turner & Co.* v. *United States*, 45 C.C.P.A. (Customs) 39, C.A.D. 669, "are analogous to those in the case at bar." In the *Davies Turner & Co.* case, the merchandise consisted of certain chairs, which were the result of two distinct manufacturing processes, described in the decision of the cited case as follows:

* * * In one process, known as "ribboning," the elements are formed by making a number of parallel saw cuts in the wood to be bent, inserting strips of wood combined with glue in the saw cuts, bending the wood by hand or air pressure, and clamping it in a form until the glue is set. In the other process, known as "laminating," strips of wood, glued on both sides, are laminated under pressure and simultaneously bent to the desired form, then dried.

The chairs involved in the cited case were classified under the provision for bent-wood furniture in paragraph 412 of the Tariff Act of 1930, as modified by T.D. 50797. The importer, appellant, claimed that the merchandise was properly classifiable under the general provision for furniture, wholly or in chief value of wood, not specially provided for, in paragraph 412 of the Tariff Act of 1930, as modified by T.D. 51802.

The factual phase of the cited case which renders it distinguishable from the present case appears as an agreed set of facts, set forth in the decision of the appellate court as follows:

The parties agree that bent-wood furniture was first made in Vienna, Austria, more than a hundred years ago by a process which involved subjecting solid pieces of wood to steam or boiling water, thus rendering them pliable, bending to the desired shape until dried, after which they retain the bent shape. It is agreed that *furniture made in such manner was the only "bent-wood" furniture known when the Tariff Act of 1930 was enacted, and that the ribboning and*

*laminating processes were not developed until several years later.* [Italics supplied.]

It will be noted from the foregoing quotation that, in the cited case, there was positive evidence—in fact, an agreement between the parties—that bent-wood furniture, as it was known at the time of enactment of the Tariff Act of 1930, was furniture made in a certain manner that followed certain processes. There is no comparable factual situation herein. The record before us will not support a positive finding that crude barytes ore, as it was known at the time of enactment of the Tariff Act of 1930, referred to a commodity of some specific percentage of barium sulphate and restricted to certain uses. On the contrary, there is testimony herein to the effect that crude barytes ore with a barium sulphate content of less than 90 per centum was a commercial commodity prior to enactment of the Tariff Act of 1930, and that the preference for barytes ore with a minimum barium sulphate content of 90 per centum was an economic factor.

The tariff provision invoked by the collector in his classification of the present merchandise reads "Barytes ore, crude or unmanufactured," paragraph 67, as modified by T.D. 54108, which, in plain and unambiguous language, contemplates a certain class of merchandise without regard to quality or use. There is no dispute that the commodity in question is crude barytes ore. Plaintiffs' case has been presented with certain legal principles in view, but which, in my opinion, cannot be applied herein on the basis of the record before us. The collector's classification of the merchandise carries a statutory presumption of correctness that has not been overcome. The protest should be overruled.