(C. D. 1297)

C. J. Tower & Sons *v.* United States

United States Customs Court, Third Division

(Decided January 29, 1951)

*Barnes, Richardson & Colburn (Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Samuel D. Spector* and *Richard F. Weeks,* special attorneys), for the defendant.

Before Cline, Ekwall, and Johnson, Judges

Johnson, Judge: This action involves the classification of certain merchandise invoiced as 1 barrel of "Fused Zirconia Concentrates." It was classified as an earthy or mineral substance wholly or partly manufactured under the provisions of paragraph 214 of the Tariff Act of 1930, at the rate of 30 per centum ad valorem. The plaintiff claims that said merchandise is properly free of duty under paragraph 1719, as amended by the Brazilian Trade Agreement, T. D. 48034.

The paragraphs of the Tariff Act of 1930, and amendments thereto, provide as follows:

Par. 214. Earthy or mineral substances wholly or partly manufactured and articles, wares, and materials (crude or advanced in condition), composed wholly or in chief value of earthy or mineral substances, not specially provided for, whether susceptible of decoration or not, if not decorated in any manner, 30 per centum ad valorem; * * *.

Par. 1719. Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for.

(T. D. 48034)

*Trade agreement—Brazil*

\*    \*    \*    \*    \*    \*    \*

Schedule II

| Tariff Act of 1930 paragraph | Description of articles | Rate of duty |
| --- | --- | --- |
| 1719 | Zirconium ores or concentrates | Free. |

John Alden Upper, the plaintiff's first witness, testified that he was a research engineer at the Niagara Falls, Chippewa plant of the Norton Co., Ontario, Canada; that the zirconium ore is purchased from the Foote Mineral Co. of Philadelphia and is known as zirkite; that such ore contains 75 per centum zirconium oxide, and the gangue remaining contains iron, alumina, silica, titania, and lime; that the zirkite is processed in order to remove the unwanted materials; and that the result of the concentrating processes increases the zirconium oxide from 75 per centum to 95 per centum.

The witness further testified that the concentrating process consists in the removal or diluting of the admixed materials in order to get the zirconium oxide by itself. The process was described by the witness substantially as follows:

The ore as received is mixed with coke to reduce the constituent impurities to their metallic condition; then iron borings are added to absorb and reduce elements freed by the coke; and then this mixture is fused in an electric furnace. After cooling, the outer zones that are not fully concentrated are removed, leaving the concentrate in a dense mass. The mass is then broken up into smaller particles to facilitate shipment. That constitutes the imported material. The iron with the undesirable constituents has been removed by a process of magnetic separation.

The witness further testified that the zirconium oxide, appearing in the official sample marked in evidence as exhibit 1, is the same oxide found in nature; that zirconium oxides and insuloxides are the same, the insuloxide being chemically purified zirconium oxide.

When asked on cross-examination if it was his opinion that the Government chemist was wrong, when he found 90 per centum zirconium oxide and 5 per centum titanium in the analysis of the imported material, the witness positively stated that the Government chemist was in error in finding on analysis that the material contained such percentages, because the ore contained 95 per centum zirconium oxide and only about 1 per centum titanium.

Wallace Mackey Hazel, plaintiff's second witness, testified that he was the chief chemist at the Norton Co.'s Chippewa plant and had analyzed hundreds of samples of zirconium products during the last 3 years; and that the ore was analyzed by the only method that could be used to analyze such material in order to obtain a correct result. The witness described his method of analysis as follows:

To analyze, the first thing is to pulverize a sample. It is then put into a solution form. To do so, the material is fused with a flux and dissolved in an acid solution. The first step in the analysis would be to determine the silica, then dehydrate the sample by either taking it to dryness or down to fumes. After the silica was removed, the iron and titania would be determined, and then the lime or magnesia

content. The analysis of those constituents would be made on that solution. The analysis of the zirconite ore from which exhibit 1 was made disclosed that the silica was 15.74 per centum; the iron content, that is, ferrous oxide, was 2.96 per centum; the titania content, that is, titanic oxide, was 1 per centum; and the lime was 0.24 per centum. The remainder, with the exception of a few minor impurities, would be 80.06 per centum, the zirconium oxide of which is determined by the difference.

The witness further testified that the analysis of exhibit 1 disclosed that the silica content, that is, silica dioxide, was 0.13 per centum; the iron content, ferrous oxide, was 0.52 per centum; the titania content, titanic oxide, was 0.85 per centum; the lime content was 0.28 per centum; and the remainder was zirconium oxide, amounting to 98.22 per centum. In the opinion of the witness, exhibit 1 is very definitely a zirconium concentrate, for the reason that a concentrate is actually the raising of the essential constituent and the removal of any heterogeneous or admixed material from any mineral; that wherever a mineral or an ore is concentrated, the main constituent of that ore is increased. That is to say, the entire purpose of concentration is to produce an increase or improvement in the essential ingredient of that mineral or ore. According to the witness, from a chemical point of view, the 98.22 per centum of zirconium oxide is the same in composition as the 80.06 per centum of zirconium oxide; that the quantity only has been increased, and the increase was caused because the admixed materials, or the gangue, have been removed.

The witness further testified that the purpose of the processes used was to concentrate the zirconium for the purpose of making refractories; that there are certain elements in the zirkite which prevent it from being used effectively as a refractory, otherwise there would not be any processing of the material; and that the process is performed merely for the purpose of eliminating or reducing the so-called obstacles to a proper refractory proposition. However, after merchandise like exhibit 1 is produced, there are several processes through which it is taken before it gets to a stage where it can be effectively used as a refractory element. The witness was also of the opinion that an ore may be a chemical; for example, aluminum oxide is an ore, although it can be made very pure; that aluminum oxide is also a chemical, and that the same is true of zirconium oxide.

Dr. Gordon Roy Finley, a research chemist of the Norton Co. of Niagara Falls, Ontario, Canada, testified on behalf of the plaintiff that he was acting as a petrographer, involving the examination of minerals under the microscope, indicating and determining what the constituents are; that he has observed samples of various preparations of zirconium, such as in powdered form, and as a concentrate, such as exhibit 1, and that he has also examined zirkite ores; that the dif-

ference between zirconium, the metal, and zirconium, the mineral, is that the metal is an element and the mineral contains the element in the form of oxide, and also impurities, contaminants, and gangue. In his opinion, exhibit 1 was a concentrate of zirconia, because the process it has undergone has enriched its zirconia content by removing the gangue and contaminants, so, as it stands now, exhibit 1 contains more zirconia than it did before being processed. The witness further testified that by microscopic examination the sample contains baddeleyite, which is zirconium oxide, and the sample, exhibit 1, contains more baddeleyite than it did when it was received as zirkite, and this increase in zirconia content indicated to the witness that it had undergone a concentration process. Therefore, the witness felt certain that the gangue and other contaminants had been removed, exhibit 1 representing a concentrate.

The witness further testified that zirkite ore originates in Brazil, which has the only deposits of zirconium ore at the present time; that "Zirkite" is a trade name of the Foote Mineral Co. The witness, as to the composition of the ore, testified that the major constituent of the ore is baddeleyite; that it contains zircon (zircon is zirconium silicate) and also an altered zircon, with minor amounts of free silica in the form of quartz; and that, in his opinion, exhibit 1 is a zirconium concentrate despite the fact that it contains 98.22 per centum of zirconium oxide.

The witness further testified to the effect that there was approximately 45 per centum zircon and altered zircon present in the zirkite, about 50 per centum of baddeleyite, and about 3 per centum quartz. In the process applied to the zirkite, the zirconium silicate or zircon was changed to zirconium oxide or zirconia, as exhibit 1 does not contain much zirconium silicate. But in his opinion, however, zirconium oxide, which is found in exhibit 1, is not different chemically from the zirconium oxide which is found in zirkite ore. The zirconium silicate, after the removal of the silica, is now zirconium oxide. The content of zirconia has been increased with the removal of the silica, which amounts to a concentration. In other words, the zirconium silicate content of the ore has lost its silica, and the zirconium oxide content of the original ore is made recoverable.

Counsel for the plaintiff contends that the merchandise in question is a crude mineral, not advanced in value or condition by refining or grinding, or by any other process of manufacture beyond that necessary to get the zirconium by itself; that all that has been done is to concentrate the zirconium through the removal of the gangue and impurities.

Counsel for the Government contends that the crude mineral has been partially manufactured from an ore to a refractory and is, therefore, no longer provided for under paragraph 1719 of the Tariff Act

of 1930 as crude minerals, not advanced in value or condition. Not being within the provision, it also is excluded from the amendment thereto, T. D. 48034, for zirconium ores or concentrates.

The evidence before us in this case clearly establishes that the merchandise consists of zirconium concentrates, as processed from zirconium ore. Three well-qualified witnesses testified to that effect and such testimony was not refuted on the part of the Government. In fact, the Government did not produce any witnesses in rebuttal.

In the case of *In re McKesson & Robbins*, G. A. 4564, T. D. 21638, certain sulphide of antimony was before the Board of General Appraisers. It was assessed as a nonenumerated manufactured article, but claimed free of duty as crude sulphite of antimony ore. The board described the merchandise as having been produced as follows:

* * * We are of the opinion that paragraph 476 [Tariff Act of 1897] covers only antimony ore, and that the descriptive phrase "crude sulphite of" was intended to show the kind of antimony ore that Congress had in mind.

Ore is a natural substance taken from the earth, usually of the metallic-mineral order. * * * Ores do not lose their character as such by undergoing processess like hand picking, sorting, or crushing; but when such native substances have been fused or melted they are not longer known as ores.

The merchandise in question is produced by fusion, and during the melting process the gangue or slag is separated, while the sulphide of antimony is run off in ingots. In this operation the sulphide of antimony has undergone no change, and it is, therefore still crude sulphide of antimony. Could the tariff provision be construed to apply to crude sulphide of antimony, not in the form of ore, the protest would be well founded; but, as has been said, we hold that paragraph 476 covers only antimony ore.

The board held that when such native substances have been fused or melted they are no longer known as ores. The importer appealed the case to the United States Circuit Court for the Southern District of New York. The circuit court reversed the Board of General Appraisers. See *McKesson & Robbins v. United States*, 113 Fed. 996. Judge Coxe, speaking for the court in that case, stated:

* * * Sulphide of antimony is well known to all the witnesses. It seems to be the product of a process by which the gangue or slag is separated from the ore by heat. The importation here is such a product; the rock and slag has been removed and the ore is imported. It is also conceded that if the paragraph of the free list read *crude sulphide of antimony* it would aptly describe the importation in controversy. In view of the similar provisions in previous acts it is to me entirely clear that this was precisely what congress intended. There is no other substance known in the act as crude sulphide of antimony except the importation in question. It would be a strained construction to interpret paragraph 476 precisely as if the words "crude sulphide of" were omitted, and as if the paragraph applied only to antimony ore. [Italics supplied.]

In the case of *In re Myers & Co.*, G. A. 5859, T. D. 25804, the merchandise consisted of copper ore, concentrated. Duty was

assessed thereon as a nonenumerated manufactured article. The importer claimed that the merchandise was free of duty under paragraph 629, Tariff Act of 1897, as ores of copper. In holding the merchandise free of duty, as claimed, the Board of General Appraisers stated that the concentration of the ore did not remove it from the category of copper ore, for although impurities were to some extent eliminated by the process, the article still remained copper ore.

In the case of *United States* v. *Continental Color & Chemical Co.*, 2 Ct. Cust. Appls. 165, T. D. 31679, it was held that hydroxide of chrome, which is a material reclaimed by various processes, patented and otherwise, from anthracene, was held to be an article in a crude state.

In the case of *Hampton, Jr., & Co.* v. *United States*, 6 Ct. Cust. Appls. 392, T. D. 35926, the appellate court distinguished the case of *Myers* v. *United States*, 1 Ct. Cust. Appls. 506, T. D. 31531, involving corundum ore concentrates. The article there was a product of corundum, crushed and ground into different degrees of fineness, and divided into grades more or less uniform in size. It had a distinct commercial name and was ready for use in the condition as imported. It had *per se* been subjected to crushing processes, segregating processes, and grading processes. In other words, manufacturing processes had been applied upon the article itself, as distinguished from being applied upon the rock or gangue from which the article had been reclaimed.

In the *Hampton* case, *supra*, the merchandise was molybdenite. It is a mineral composed of metal molybdenum and sulphur. The court described it as a natural mineral, and as imported it is in the condition as found in nature. As found, it is in a rock or gangue formation, and is obtained by separating the molybdenite from the gangue, effected by means of crushing the rock and obtaining the molybdenite by means of a flotation process. Before it can be used, it must be roasted to free the sulphur and to produce the crude metal molybdenum. As imported, it is useless until put through the necessary processes to devote it to one of its ultimate uses. In holding that the import had not been subjected to any of the named processes provided for in the crude mineral paragraph, the court stated:

* * * It may be generally said that it has been uniformly held in customs interpretation that the application of processes necessary to produce an article from its native condition and to bring it into a condition that it may be imported, without affecting its *per se* character, is not regarded either as a manufacturing process or as a process advancing it in value or condition. * * * Indeed, if this were not true we must hold that the condition of the article referred to as "not advanced in value or condition" is its condition in its native state, in the bowels of the earth, in the heart of the tree, or in its other original place of discovery, wherefore no article the subject of commerce could respond to that definition.

From a careful examination of the evidence in this case and in view of the foregoing cases, it is clear to the court that the zirconium concentrates in question have not been affected in character from their condition in the native state by the processes applied thereto. The ore still consists of zirconium oxide, although in a more concentrated form. The process through which it has been placed has not advanced the ore in value from the condition as it is found in the earth. It has not acquired a new name or a new use. The most that can be said of the imported material is that it contains a greater percentage of zirconium oxide than the ore in the condition when taken from the ground.

Judgment will therefore be entered in favor of the plaintiff directing the collector to reliquidate the entry, and to classify the same under the provisions of paragraph 1719, as amended, *supra*, and refund all duties assessed thereon.