(C.D. 2618)

HAYES-SAMMONS CHEMICAL CO.
HAYES-SAMMONS CO. } *v.* UNITED STATES

United States Customs Court, First Division

(Decided February 21, 1966)

*Stein & Shostak* (*Marjorie M. Shostak* and *S. Richard Shostak* of counsel) for the plaintiffs.

*John W. Douglas*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before OLIVER, WILSON, and NICHOLS, Judges

NICHOLS, Judge: The merchandise involved in the two cases presently before the court is covered by two protests, No. 58/17794 and No. 60/27892, and is described on the invoices and entries as crude barytes ore in bulk, low-grade barytes ore. That covered by protest No. 58/17794 was entered on April 10, 1958, and was assessed with duty at $2.70 per ton under paragraph 67 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as barytes ore, crude or unmanufactured. That covered by protest No. 60/27892 was entered between June 1 and June 7, 1960, inclusive, and was assessed with duty under said paragraph, as modified, at $2.55 per ton. It is claimed that the merchandise is entitled to free entry under paragraph 1719 of said tariff act, as crude minerals, not specially provided for.

Paragraph 67, as modified, provides:

| Tariff Act of 1930, paragraph | Description of Products | Rates of Duty | | |
|---|---|---|---|---|
| | | A | B | C |
| 67 | Barytes ore, crude or unmanufactured. | [Effective 6/30/56] $2.85 per ton | [Effective 6/30/57] $2.70 per ton | [Effective 6/30/58] $2.55 per ton |

Paragraph 1719 provides:

Par. 1719.   Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for.        [Free.]

It was stipulated at the trial that the merchandise, in its condition as imported, was in a crude state, not advanced in value or condition by refining or grinding, or by other process of manufacture.   Attached to the entry papers are certificates of the United States Customs Laboratory at New Orleans stating that the samples were barytes ore or crude barytes ore.   Hazen G. Sorrell, deputy appraiser at Brownsville, testified at the trial that his advisory classification was made on the basis of these reports.

This case is largely a retrial of the issues involved in *United States* v. *Victoria Gin Co., Inc., W. H. Morton*, 48 CCPA 33, C.A.D. 759, with additional evidence being presented and a somewhat different theory advanced.   The two shipments in that case had a barium sulphate content of 84.8 and 85.1 percent, respectively, and were held to be barytes ore.   The merchandise here, so far as shown, had a barium sulphate content ranging from 76.4 to 88.9 percent and specific gravity ranging from 4.28 to 4.37.[1]   The plaintiffs contended there, as here, that the tariff term "barytes ore, crude," as used in the trade and commerce of the United States at the time of the enactment of the Tariff Act of 1930 referred only to a material containing 90 percent or more of barium sulphate and used in the manufacture of lithopone, ground barytes, and barium chemicals.   No claim was made that the commercial meaning was different from the common meaning.   It appeared from the testimony that, before 1930, the principal commercial uses for crude barytes ore were in the manufacture of lithopone, the

---

[1] Certificates of analysis of Pan American Laboratories, attached to the entry papers covered by protest No. 60/27892, received in evidence without being marked.   The certificates attached to the entry papers covered by protest No. 58/17794 were not received in evidence because plaintiffs were unable to connect them with the imported merchandise.

preparation of ground barytes, and the production of barium chemicals, and that purchasers demanded a barium sulphate content of over 90 percent. It also appeared that, after 1930, there developed a use for ground barytes in the oil drilling industry. It was added to the mud used in the drilling of wells to balance the weight of the tools and to promote safety by preventing blowouts. Ore of a lower specification as to barium sulphate content could be used. This court held, Oliver, C. J., dissenting, that the new use which had been conferred upon ore containing less than 90 percent barium sulphate did not bring it within the meaning of the tariff term "barytes ore, crude," at the time of the enactment of the tariff act. *Victoria Gin Co., Inc.,* and *W. H. Morton* v. *United States,* 43 Cust. Ct. 166, C.D. 2121. The court of appeals reversed (*United States* v. *Victoria Gin Co., Inc., W. H. Morton, supra*), pointing out that there was evidence that crude barytes ore having a barium sulphate content of 85 to 89 percent was offered and sold prior to 1930 and that, where a 92 percent barium sulphate content was specified in purchase orders, a variance was allowed "up and down." The court also stated (p. 37) :

In this connection it will be noted that most of the textbook and other references quoted by the Customs Court as defining crude barytes as containing more than 90% of barium sulphate make it clear that what they are talking about is the "commercial grades" of the crude ore. This certainly means that these authorities recognize that there are other grades of the ore and, in fact, the United States Department of Commerce Information Circular of January 1930 states that "Commercial crude barite should carry more than 90 percent barium sulphate * * *. Ore running less than 90 percent barium sulphate is not commonly acceptable to the lithopone and barium chemical manufacturers * * *." As a matter of fact, none of the definitions relied on by the Customs Court exclude the lower percentages from the meaning of "crude barytes ore."

    \*       \*       \*       \*       \*       \*       \*

It should be observed that it does not appear that the extraction of barium sulphate from a low grade ore is, or was in 1930, impossible. As one of the importer's witnesses testified, it was largely a matter of economics. We think, however, that the Customs Court overemphasized the factor of profitable use for the material. True, both the Webster International and the Oxford dictionaries make it a part of their definitions of an ore that the mineral can be profitably mined and extracted. That, of course, is proper for the court's consideration, but we do not think that Congress intended to tie the meaning of the term which it adopted inseparably to the market conditions of 1930. We may assume that Congress knew that the laws of supply and demand are sometimes rudely disturbed by wars or other economic upheavals and that sudden and drastic changes in the marketability of many products follow, often resulting in a demand for things theretofore considered of little value. Congress could have easily specified the barium sulphate content requisite for the imposition of a duty if it had

wished to tax only the product dealt in, but it chose to use a general term which included more than that. However, it is unnecessary to discuss that phase of the court's opinion because we are of the opinion that the evidence is insufficient to establish that the common meaning was limited as the importer contended.

The record in that case has been incorporated herein.

Subsequent to the decision in the *Victoria Gin* case, *supra*, this court held in *Eugenio Mireles* v. *United States*, 50 Cust. Ct. 285, Abstract 67670, that certain material classified as barytes ore, crude, was properly free of duty under paragraph 1719 as crude minerals, not specially provided for. The court stated (p. 286):

Stipulated facts, upon which the case has been submitted, show that the present merchandise is crude minerals, that it contains "less than 40 percent barium sulphate, more than 40 percent ferric oxide, with the remainder consisting of silica and calcium salts," that the "said merchandise was not sought for its barium sulphate or for its ferric oxide content, but was sought for the specific gravity of the imported material in toto," that "said merchandise was imported solely to be used as a weighting for coating pipe," and that it "was not used for its barium sulphate or ferric oxide content."

The agreed facts are sufficient to establish the correctness of plaintiff's claim. Accordingly, we hold the merchandise in question to be free of duty under paragraph 1719, *supra*, as crude minerals, not specially provided for, as claimed.

Plaintiffs claim that the merchandise at bar is like the mineral material in the *Mireles* case, *supra*, because it was sought and used solely for its specific gravity, as a weighting material, and not for its barium sulphate content.

Evidence in the instant case showed that the material imported from Mexico, referred to as barite, was purchased and sold pursuant to no specification that it have any specific barium sulphate content. Such merchandise was ground and sold to oilfield drillers and producers drilling oil and gas wells for use in drilling mud. One company also sold it for weighting down pipes so they would sink and for weighting pneumatic tires to give them more traction. In those cases also, the specific gravity was the prime function of the material.

The plaintiffs herein regularly had the material tested not only for its specific gravity but for its barium sulphate content. Another importer had barium sulphate tests run for a short time, but not thereafter. A third did not run chemical tests but only the physical test for specific gravity. One witness testified that hardness tests were run to show the soluble calcium and magnesium salts present, as they have a somewhat deleterious effect on some drilling muds, and it is

desirable to keep them at a minimum. Tentative specifications of the American Petroleum Institute covering barite for drilling muds, drawn up in March 1962, were received in evidence as plaintiffs' exhibit 6. They provide for a minimum specific gravity of 4.20 and require a hardness test and a wet screen analysis. These was testimony that these specifications were accepted by the industry as minimum standards and were more lenient than those used prior to that time.

The witnesses did not use the material imported from Mexico for extracting barium sulphate or any other mineral. Claborne B. Brazeal, president of the importing company, testified that the material was marketed as barite drilling mud and was not offered for any other use, "[b]ecause we felt like that we didn't have material to offer to any other market. The material was not suitable for any other market except for the drilling mud industry." He did have a request from the Pittsburgh Plate Glass Co. for some chemical grade material but he was unable to meet their specifications of at least 94 percent barium sulphate and relatively small amounts of other minerals, such as iron and strontium. Other witnesses also had attempted to sell the material for paint pigment or for the manufacture of barium chemicals, but could not meet the required specifications. A witness whose firm mined and sold barytes ore for these purposes testified that it was sold on the basis of a barium sulphate content of 96 percent and an iron content of 1 percent.

John G. Lipps, Jr., a chemical engineer and owner and manager of Pan American Laboratories, testified that he had made over 5,000 analyses of material imported by the plaintiff company from Mexico for specific gravity and barium sulphate content. Specific gravity varied from 4.19 to 4.38 and barium sulphate from 75 to 95 percent. Other materials were present which have a similar specific gravity, such as strontium sulphate and some iron compounds. He also detected without quantitative or qualitative analysis, the presence of a material commonly called $R_2O_3$, a mixture of iron and aluminum oxide, and sometimes noticed the presence of carbonates and traces of metallic elements, such as nickel and copper. In analyzing the material covered by protest No. 60/27892, he noted the presence of a mixture of inorganic minerals and less than 1 percent of metallic material. Carbonates and $R_2O_3$ were also detected in material which contained over 90 percent barium sulphate. He had made 5 or 10 complete analyses of the material, which included strontium content, iron content, silica, metallic elements, manganese, and barium carbonate.

Paul Seitz, a chemist associated with the plaintiff company, who also tested the barite material imported from Mexico for specific grav-

ity and for barium sulphate content, found the former to range from 4.18 to 4.4 and the latter from 75 to over 90 percent. He detected the presence of $R_2O_3$, which he described as a compound including ferric oxide and aluminum trioxide. He found no correlation between the specific gravity and the barium sulphate content of the material.

We do not choose to be drawn into a review of our appellate court's decision in the *Victoria* case, *supra*, for the purpose of expressing our concurrence or nonconcurrence with the law announced therewith. So far as we are concerned, it is the law. Plaintiffs nowhere clearly state whether they accept this, but they do make somewhat changed arguments from those in the prior case.

Basically, the situation is as follows: There is a specific duty, per ton, on "Barytes ore, crude." There is no provision confining the duty base to the pure barytes content, as is done in, e.g., paragraph 302.[2] Converted to an ad valorem equivalent the rate is stiff, as is roughly indicated by the entries herein: Thus, in entry No. 3006, $357 worth of material generates $515.30 duties, and other entries correspond. It is reasonable to suppose that the Congress intended some cutoff line below which the mere presence of barytes (barium sulphate) in a crude mineral aggregate would not make the whole dutiable at the same rate that would apply to a pure or nearly pure shipment. The stipulated case, *Eugenio Mireles* v. *United States*, *supra*, reflects such an interpretation, followed by customs officers where the barium sulphate content was under 40 percent, and the ferric oxide content was higher. But we are not informed just how or where customs officers draw the line.[3] Counsel sought in the *Victoria* case, *supra*, to prove that the proper cutoff line is 90 percent by reason of that having been at or below the lower limit of commercial acceptability for barytes ore in 1930. Two of our judges agreed, but our appellate court did not. However, a careful reading of their opinion discloses no intent to pass on any method of drawing the line except the one placed before them. Counsel now suggest other methods, not previously considered, which they say would require, if applicable, sustaining of the protests before us. We review the evidence and plaintiffs' brief as bearing on these other methods and give them no consideration as attacking our appellate court's reasoning in the *Victoria* case, *supra*.

[2] "(a) Manganese ore (including ferruginous manganese ore) or concentrates and manganiferous iron ore, all the foregoing containing an excess of 10 per centum of metallic manganese, ¼ ¢ per lb. on the metallic manganese contained therein." Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802.

[3] Note T.D. 55550(C) amending a drawback rate previously granted covering ground barytes manufactured with the use of crude barytes ore containing 88 to 96 percent barium sulphate, to cover ground barytes manufactured with the use of crude barytes ore containing 80 to 87 percent barium sulphate.

Plaintiffs' leading and main contention we may paraphrase as being that the term "crude barytes ore" is a sort of bastard use provision, meaning ore of such grades as are chiefly used today for the purposes for which barytes were employed in 1930. If 85 percent ore were used today in production of lithopone, as ore of 90 percent, plus, was used in 1930, then 85 percent ore would be "crude barytes ore," but if today's uses of the 85 percent grade are all uses unknown in 1930, then it is not. This view yields some ground to our appellate court's argument that the commercial acceptability of low-grade ores is altered by "wars or other economic upheavals," and the Congress could not have intended to tie the meaning of a tariff term to the market conditions of 1930. It would admit low-grade ore to dutiability whenever it was admitted to the factories of 1930 users.

The difficulty here is that plaintiffs' witnesses in the new case, all from the southwest and familiar chiefly with use of barytes in oil well drilling, do not show sufficient familiarity with other barytes-using industries to testify persuasively that they cannot or do not use low-grade ore. Conceding *arguendo* that they do not buy the imported Mexican variety, this may be due to considerations of transportation distance, which are likely to be controlling where a bulk low value, crude material is involved. The unsuccessful efforts to sell Mexican barytes to these industries were not sufficiently sustained or widespread to meet the difficult burden of proving a negative.

Furthermore, it is contrary to authority binding on us to hold that a tariff designation of a commodity by specific name, without stated limitation, is, nevertheless, limited by implication to grades and kinds chiefly used for particular purposes, or suitable for such use. *United States* v. *Page N. Goffigon*, 43 CCPA 172, C.A.D. 625; *United States* v. *William Clarke Co.*, a/c *American Agar & Chemical Co.*, 50 CCPA 67, C.A.D. 822; *C. J. Tower & Sons* v. *United States*, 47 CCPA 85, C.A.D. 734. In the *Goffigon* case, plaintiff relied on the fact that the merchandise there involved, pumice, was listed under "abrasives" in United States Import Duties (1950), and argued, unsuccessfully, that the designation thus covered only pumice suitable for that use.

We conclude that to sustain the protests on this ground would involve judicial legislation we are not authorized to engage in.

The next line of argument we consider in our analysis of plaintiffs' contentions, is that merchandise should not be classed as barytes ore, crude, if it is not bought and sold for its barytes content. Here again the fact foundation in this case is unstable. The merchandise is entered and invoiced as crude barytes ore and plaintiffs know by the chemical analysis it runs what they are importing. Witnesses stated that the barytes content *per se* was without commercial signifi-

cance. We cannot attach great weight to this self-serving allegation. Barytes are of unusually high specific gravity and this quality is important in the production of oil drilling mud, for which the merchandise is used. Perhaps any other ore or aggregate of equal specific gravity would do as well, but we do not know what, if any, others are locally available or at what price.

Suppose, however, we were persuaded that plaintiffs cared not at all whether the carloads they bought were 100 percent barytes, or 50 percent, or even less. The finding would be without legal significance. Normally, components that would influence the tariff classification of merchandise and the duties applicable are not prevented from doing so by being unwanted and even eliminated in further manufacture. *American Smelting & Refining Co.* v. *United States*, 13 Ct. Cust. Appls. 507, T.D. 41391. (Lead-bearing ores held dutiable on zinc content although zinc was not recovered, was eliminated in manufacture, and was positively detrimental.) This division recently had occasion to consider whether the principle had any exception where the discovery in a manufactured article of one insignificant, unspecified, previously unknown bamboo component led the collector to classify the article as "in part of bamboo." (*John S. Connor, Inc.* v. *United States*, 54 Cust. Ct. 213, C.D. 2536.) We upheld the protest, but the case was a close one. Here, the presence of the barytes is known, and verified by analysis before importation, it is substantial, and it contributes a quality needed in the manufactured product for which the import is used. No more need be said, but for the curious use made by plaintiffs of our decision in the stipulated case, *Eugenio Mireles* v. *United States*, *supra*. The recital of the stipulated facts in the abstract as published, is not complete. It was also stipulated that if the collector, the appraiser, and the examiner had known the facts originally, then known, they would have classified under paragraph 1719, as plaintiff claimed. If the published finding that the merchandise was not sought for its barium sulphate content establishes that it must be so "sought" to be classifiable under paragraph 67, then the unpublished stipulation likewise establishes that the appraiser and the examiner are legal classifying officers, though the court refused to decide the case under the stipulation until the collector was added to the appraiser and examiner already named. Novel doctrines of law cannot be erected by inference from a mere recital of stipulated facts. The decision in the case was proper under *all* the facts before the court by stipulation.

Next, plaintiffs argue with dictionary quotations that the word "ore" in paragraph 67 limits the generality of the remaining language. Defining "ore" as a mass from which some valuable constituent is

extracted, plaintiffs say this excludes low-grade ores not commonly used for extraction. We find that in common speech, the word "ore" is frequently associated with the modifier "low-grade" to denote deposits which are not mined at the moment for reasons of economics and technology, but are held in reserve for changes in the supply and demand situation such as our appellate court referred to, or changes in techniques. Dictionary definitions may fail to reflect this, by inadvertence. Such dictionary definitions may refer to future profitable extraction, not that of the present alone. Despite the great weight we give to dictionary definitions, it should always be understood that making dictionaries and making laws are two different occupations, governed by divergent rules. The intent of the law maker must control. Here, the merchandise involved was covered by the term "Baryta, sulphate of, or barytes," sometimes with the additional words "including barytes earth" before the 1922 act. The term "barytes ore" was substituted in the act of that year because the Tariff Commission considered that the term "sulphate of baryta" was "inconsistent with good chemical terminology." There was no intent to shift anything to the free list, stated or implied, just to avoid appearing ignorant in the eyes of the pundits. See Summary of Tariff Information, 1920, page 99, and *id.*, 1921, page 188. Accordingly, we hold that the word "ore" did not limit the otherwise natural meaning of the words "barytes, crude," to such minerals as were amenable to techniques for profitable extraction of refined barytes in 1930 or any other date.

Finally, plaintiffs refer to the rule of *noscitur a sociis* (a man is known by the company he keeps). Paragraph 67 being located in the 1930 act in the midst of a number of provisions, paragraphs 65–76, that relate to paints and pigments, it is suggested that the barytes ores referred to in paragraph 67 must be limited to such as are used in the manufacture of paints and pigments. This method of interpretation is of value in certain ambiguous situations (*Cf. United States* v. *J. Schultz & Co.*, 20 CCPA 129, T.D. 45755), but one must be careful not to use it for more than it is good for. It would be of greater value, obviously, if one postulated that the schedules of the 1930 act are orderly and systematic, but the Tariff Commission has said that they "treat with numerous classes of significant commodities in a fragmentary, unsystematic manner * * *," Tariff Classification Study (1960) Submitting Report, page 5. Hence, a paragraph that is seemingly out of step with its neighbors will be no surprise and ought not to be distorted out of its natural meaning to achieve some fancied purpose of symmetry. But plaintiffs' interpretation does not achieve symmetry, it leaves paragraph 67 still out of line, because it covers the crude

substance from which a pigment is made, and the other paragraphs do not. To change the metaphor, we see paragraph 67 marching down the street in a blue uniform while its fellows in the ranks wear brown; plaintiffs say we should hunt around for a pair of spectacles that will enable us to see them dressed all in the same color, and what we see through those spectacles will be the truth. No doubt this method of statutory construction will have more value when we enter more extensively into construing the majestic order and harmony of TSUS. For the present, we would use plaintiffs' technique with the doctrine of *noscitur a sociis* only to confirm and bolster up an interpretation arrived at by other means, not to refute it. In other words, plaintiffs are right about *noscitur a sociis* only if they are right in their other points, and we have held they are not.

Since plaintiffs have introduced no evidence and urged no theory under which the merchandise hereunder can be held improperly classified under paragraph 67, the protests must be overruled. We add, however, though approving the collector's classification for this reason, we are in the dark as to what theory he acted under. All we know is that he would have held differently in the circumstances of the *Eugenio Mireles* case, *supra*. Thus, we are not in a satisfactory place to state how the line ought to be drawn or foreclose future litigation based on still other theories. We can and do express skepticism whether any theory will properly exclude from classification under paragraph 67, crude barytes ore having percentages of barium sulphate as high as those involved herein.

For the reasons stated, the protests are overruled. Judgment will be rendered accordingly.

(C.D. 2619)