A.N. DERINGER, INC. A/C E–Z–EM CO., INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 83–8–01192

Before TSOUCALAS, *Judge.*

MEMORANDUM OPINION AND ORDER

(Decided September 3, 1986)

*Siegel, Mandell and Davidson, P.C. (Allan H. Kamnitz, Michelle S. Benjamin* and *Brian S. Goldstein),* for the plaintiff.

*Richard K. Willard*, Assistant Attorney General, *Joseph I. Liebman*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Department of Justice (*Michael P. Maxwell* and *Veronica A. Perry*) for the defendant.

TSOUCALAS, *Judge:* In this action, plaintiff challenges the classification by the Customs Service of certain imported barium sulfate. Plaintiff, A.N. Deringer, Inc., is the customshouse broker for plaintiff-importer, E–Z–EM Company, Inc., who uses the imported barium sulfate in the manufacture of x-ray preparations. Plaintiff claims that the merchandise is ground barium sulfate and should be classified under item 472.12, TSUS, as "Barium sulfate: Natural (barytes) * * * Ground" at a rate of $3.25 per ton. The Customs Service classified the merchandise under item 417.80, TSUS, as "Barium compounds: Other" at a rate of 4.5% or 4.7% *ad valorem* depending on the date of entry.

The issue as to the correct classification centers on the acid leaching process to which the barytes are subjected before importation. It is claimed by plaintiff that this acid wash is employed to remove residual impurities found in the barytes ore source. Defendant, however, claims that the acid wash is a process which upgrades the barium sulfate whereby it is advanced in value and condition beyond the ground stage.

Plaintiff has moved, pursuant to USCIT R. 56, for summary judgment and defendant has cross moved for summary judgment. Each party alleges that there is no genuine issue of fact to be tried. In reviewing the statements of material facts, this Court agrees that there is no genuine issue as to a material fact.

## STATEMENT OF FACTS

The merchandise in question is ground barium sulfate approximately 98%–99% pure as imported. The merchandise is mined in rock form from an ore source in Canada containing natural barium sulfate (barytes, $BaSO_4$) and iron carbonate ($FeCO_3$) particles in approximately equal proportion. The mined rock is crushed to a sand consistency, resulting in crushed ore. This crused ore is then subjected to a process which separates the slurry from the sized fractions. These sized fractions then undergo a vibratory process which separates the heavy particles containing the barytes from the lighter unwanted debris. Substantial portions of iron carbonate and other debris are removed by subjecting the heavy particles to a wet magnetic separation process. While the barytes are now of a higher purity than when mined, they may still be stained with a thin film of iron carbonate or other acid soluble impurities which were in the ore. To cleanse the barytes of these impurities which were not removed by prior processes, they are subjected to a solution of 5 normal hydrochloric acid. The barytes crystals then seem whiter in appearance. The acid wash does not chemically change the barytes. The barytes are then washed in water to eliminate the acid. Wet grinding of the barytes is achieved with a small amount of sodium citrate as a

grinding agent. There is no chemical reaction between the barytes and the sodium citrate and it does not impart any functional properties to the barytes. These barytes crystals are then spray-dried until they reach the consistency of free flowing powder. Completion of the aforementioned processes readies the merchandise for packing and shipment. The barytes do not form a new chemical composition as a result of these processes.

## BACKGROUND

Plaintiff imported the barium sulfate from Canada. The merchandise entered the country through the port of Houlton, Maine, from May 27, 1981 through August 18, 1982, and was liquidated from October 20, 1981 through September 1, 1982. Plaintiff filed a protest on October 25, 1982 contesting classification of forty entries of the barium sulfate.[1] The protest was denied on March 23, 1983. Thereafter, plaintiff filed this action.

The question presented to this Court is whether barium sulfate, which has been cleansed by an acid wash rendering it 98–99% pure, has been so advanced in value and condition that it is precluded from classification as natural ground barium sulfate under item 472.12, TSUS, and therefore, properly classified as other barium compounds under item 417.80.

## DISCUSSION

Plaintiff argues that the acid leaching is a cleansing process which does not advance the barium sulfate in value or condition beyond the ground stage. Plaintiff claims 472.12 is an *eo nomine* provision which covers all grades and qualities of the article embraced by the tariff description.[2] Finally, plaintiff alleges that 472.12 is a more specific provision than 417.80 and therefore, if plaintiff's merchandise can be regarded as ground barytes, as a matter of law, the merchandise should be classified under 472.12.

Conversely, defendant advances two arguments why the barium sulfate is processed to such a point whereby it is advanced in value and condition beyond the ground state. First, it has acquired a new name: bleached barytes; and second, it has acquired a new use: for medical preparation. Further, defendant argues that industry experts establish that the term natural ground barite is not used in the industry to describe acid leached barium sulfate. Defendant concludes that the merchandise is not within the scope of item 472.12, TSUS, rather it is properly classified under 417.80 and therefore

---

[1] Plaintiff has abandoned its claim regarding the merchandise under entry #82–230328 since the protest was not timely filed as to that entry, therefore, only 39 entries are within the protest under consideration.

[2] Before importation, plaintiff sought a prospective ruling as to the classification of the barium sulfate in question. The Customs Service issued Customs Headquarters Ruling #064210, which indicated two reasons that the merchandise would not be classified under item 472.12. Initially, Customs identified the chief use of ground barium sulfate as a weighting agent in oil well drilling mud, which does not require the purity level of plaintiff's barium sulfate. Therefore, the Customs Service determined that the ground barium sulfate, as contemplated by item 472.12, would not ordinarily undergo the chemical advancements of the product in question. Secondly, Customs concluded that where an article was advanced by process in addition to grinding, and was substantially fit for its ultimate use, it could not be included within the tariff classification of natural ground barium sulfate. Thus, Customs stated that the product would be classified under item 417.80.

summary judgment is appropriate. Alternatively, defendant claims that if this Court must ascertain the meaning of "natural ground barium sulfate" that is an issue of fact and summary judgment is not warranted.

On a motion for summary judgment the court may not resolve or try factual issues. *Standard Commodities Import & Export Corp.* v. *United States*, 9 CIT 609, Slip Op. 85–124 at 4 (Dec. 5, 1985). The sole function of the court is to determine whether any factual dispute exists which is material to resolution of the action. Summary judgment cannot be granted if any triable issue is raised. *Id.* at 4–5.

In determining the applicability of item 472.12 versus item 417.80, this Court must be guided by the rule of relative specificity. If an "article is described in two or more tariff provisions, it is to be classified under the provision which describes it most specifically." *W & J Sloane, Inc.* v. *United States*, 76 Cust. Ct. 62, 69, C.D. 4636, 408 F. Supp. 1392, 1397 (1976). *See* TSUS, General Interpretative Rule 10(c).

It should further be noted that in cases involving provisions in Schedule 4, TSUS, the scientific and technical meaning ascribed to tariff terms is applicable rather than the common meaning of these terms. *National Polychemicals, Inc.* v. *United States*, 58 CCPA 37, 41 n. 2, C.A.D. 1001, 433 F.2d 1327, 1329 n.2 (1979), *See Tariff Classification Study*, Schedule 4 at 2 (November 15, 1960). It is therefore appropriate to look to technical literature to analyze the uses and characteristics of barium sulfate. Barium sulfate may be derived artificially by treating a solution of barium salt with sodium sulfate; as a byproduct in the manufacture of hydrogen peroxide; and it may occur in nature as the mineral barite (barytes). *The Condensed Chemical Dictionary* at 109 (Tenth Ed. 1981). Futhermore, barium sulfate may be divided into grades: technical, dry, pulp, bleached, ground, floated, natural; C.P. (chemically pure); U.S.P. (United States Pharmacopeia); x-ray. *Id.* at 109.

Commercial barite is marketed in several forms: (1) as crude barite, washed free of clay and picked to remove adhering impurities; (2) as ground barite, obtained by grinding and purifying crude ore;[3] and (3) as a barium compound. *McGraw-Hill Encyclopedia of Science & Technology*, Vol. 2 at 111 (1982). Before grinding, most barite is leached by the addition of sulfuric acid in lead lined tanks. Occasionally, sodium chloride and other chemical reagents are added. *Id.* at 111. A detailed list of known uses for barium sulfate includes: weighting mud in oil drilling; paper coatings; x-ray photography; and, as an opaque medium for gastrointestinal radiography. *The Condensed Chemical Dictionary, supra*, at 109. It is noted that in these references materials bleached barite is discussed within the topic *Barite*, while the analysis of distinct barium compounds follows in a separate discussion, nowhere mentioning bleached barite.

___

[3] One source even further divides this class into (a) coarsely ground and (b) finely ground—bleached and treated. *See Encyclopedia of Chemical Technology*, Vol. 2 at 319 (1948).

*See McGraw-Hill Encyclopedia of Science and Technology*, Vol. 2 at 111 and *Encyclopedia of Chemical Technology*, Vol. 2 at 318 (1948).

The scientific and technical meaning of the tariff terms was recognized by Congress in revising the structure of the Tariff Schedules. The Tariff Commission reported to Congress that:

> Schedule 4 is primarily a classification system for chemicals and closely related chemical products. It places all chemicals and related products in a systematic, logical arrangement, using terminology which takes cognizance of the vast changes which have occurred in the chemical field since 1930, and eliminates anomalies and archaic and illogical classification.

*Tariff Classification Study*, Schedule 4 at 2 (Nov. 15, 1960).

An analysis of the tariff provisions in issue reflects this attempt to logically arrange chemical products. The barium compounds provided for under item 417.80, TSUS, are those not named or not more specifically provided for elsewhere in the TSUS, such as the compounds covered by items 417.70–78 and 472.02–.14. *Summaries of Trade and Tariff Information*, Schedule 4, Vol. 2 at 179 (1968). The *Summaries* enumerate some of the compounds covered under item 417.80: barium sulfide, barium chlorate, barium flouride, barium iodide, and barium titanate. Each one of these compounds except barium titanate is water-soluble and poisonous. *Id.* at 179. The compound barium sulfate is both insoluble and non-poisonous. *Encyclopedia of Chemical Technology*, Vol. 2 at 318 (1948). Schedule 4, Part 9, Subpart B (under which barium sulfate is classified) "comprises insoluble coloring materials of mineral origin, * * *." *Tariff Classification Study, supra* at 151. In the Tariff Schedules, the headnote to Subpart B states:

> The term *"pigments"*, as used in this subpart, means products consisting of fine solid particles or powder, in dry form, * * * or ground in or mixed with oil, water, or other vehicle, commonly known as pigments and *suitable for* [emphasis added] use in imparting color (including black and white) to paints, inks, rubber, plastics, linoleum, and other products.

It is noteworthy that precipitated barium sulfate (blanc fixe), which is listed in item 472.14 immediately following 472.12, is used for gastrointestinal x-ray work. *Chemicals of Commerce* at 93 (Snell & Snell, 2d Ed. 1952). Similarly, plaintiff's product is used in x-ray preparation.

It would seem classification of the imported barium sulfate under item 472.12 would avoid anomolies and illogical classifications, since scientific treatises describe barite by kind and grade. It is therefore appropriate to discern whether Congress intended item 472.12 to cover "grades or kinds" of natural ground barium sulfate and whether plaintiff's merchandise can properly be regarded within that context.

Where a provision in the Tariff Schedules is without stated limitation it may not be restricted by "implication to grades and kinds chiefly used for particular purposes, or suitable for such use." *Hayes-Sammons Chemical Co.; Hayes-Sammons Co. v. United States*, 56 Cust. Ct. 115, 122, C.D. 2618 (1966), *aff'd*, 55 CCPA 69, C.A.D. 935 (1968). In *Hayes-Sammons*, the issue was whether the term "barytes ore, crude" as used in paragraph 67 of the Tariff Act of 1930 referred only to material containing 90% or more of barium sulfate and used in the manufacture of lithopone, ground barytes, and barium chemicals. The testimony in that case revealed that before 1930 a barium sulfate content of over 90% was necessary for those uses. It seems that these were the chief commercial uses of barium sulfate before 1930 while the use for ground barytes in the oil drilling industry, requiring a lower barium sulfate content, developed after that time. 56 Cust. Ct. at 117–118. In *Hayes-Sammons*, the court declined to hold that the tariff term "crude barytes ore" impliedly required a minimum barium sulfate content.[4] "Congress could have easily specified the barium sulfate content requisite for the imposition of a duty if it had wished to tax only the product dealt in, but it chose to use a general term which included more than that." *Id.* at 118–119 (citing *United States v. Virginia Gin Co., Inc., W.H. Morton*, 48 CCPA 33, 37, C.A.D. 759 (1960)).

Similarly, the defendant asks this Court to imply a maximum barium sulfate content when applying the term ground barytes. However, in item 472.12, TSUS, as in the tariff provision at issue in *Hayes-Sammons*, there is no provision limiting this classification to the purity level of the barytes. *Hayes-Sammons*, 56 Cust. Ct. at 121. Therefore, it would appear that the barytes which plaintiff has imported, albeit purified, are indeed a "grade" of ground barytes, which is in fact encompassed by item 472.12. Of significance, is that the imported barytes have not undergone a chemical reaction by virtue of the acid wash, as conceded by defendant. Chemically they remain barium sulfate. *Compare United States v. C.J. Tower and Sons*, 43 CCPA 49, C.A.D. 608 (1955) (imported mineral held not to be crude where it was the result of a substantial chemical change).

Defendant argues, however, that the imported barytes are so advanced in value and condition by virtue of the acid leaching that they are no longer specifically provided for in 472.12. Plaintiff contends that the imported barytes are still identifiable and recognizable as natural ground barium sulfate. Unless the identity of the barytes is destroyed or converted into something else by processing, it remains within an *eo nomine* provision as long as the merchandise is so named. *Enrique Garza v. United States*, 66 Cust. Ct. 212, 217, C.D. 4192, 324 F. Supp. 91, 95 (1971).

---

[4] In its decision, the court relied on the reasoning in *United States* v. *Virginia Gin Co., Inc., W.H. Morton*, 48 CCPA 33, C.A.D. 759 (1960). The issue in both cases was essentially identical. In *Virginia Gin* the appellate court observed that technical references define crude barytes as containing 90% barium sulfate and therefore, recognize that there are commercial grades of crude barytes ore.

If plaintiff's merchandise can be classified as natural ground barite, then summary judgment should be granted in plaintiff's favor because "an *eo nomine* [provision] must prevail over words of general description which might otherwise include the article specially designated." *W & J Sloane, Inc.* v. *United States*, 76 Cust. Ct. 62, 69, C.D. 4636, 408 F. Supp. 1392, 1397 (1976) (citing *Chew Hing Lung* v. *Wise*, 176 U.S. 156, 160 (1900)). Central to this determination is whether the merchandise is advanced in value and condition from its ground state and whether the ultimate use of the article is relevant in this classification.

In *United States* v. *Sheldon & Co.*, 2 Ct. Cust. App. 485, T.D. 32245 (1912), the court concluded that gum resin was not advanced in value or condition from its crude state (oleoresin). This oleoresin (crude turpentine) was vaporized, permitting the turpentine to escape, whereupon the residue of the oleoresin was let off through strainers into a vat. This residue, the resin content, then passed through screens which removed the chips, barks, insects and dirt which accumulated in the reclamation of the oleoresin from the trunk of the tree. *Id.* at 487. There was no change in the resin per se, merely a restoration to its crude or natural condition. The court did not consider persuasive that crude turpentine as it exudes from the trees and "unstrained" resin are sometimes put on the market without undergoing the aforementioned process. The court stated:

> The record shows that a variety of grades of resin are produced. There is a consequent variety of prices dependent upon the grade of the article. Among the well recognized grades of resin are those dependent upon color. * * * By the slightest change in the process there would be produced a different grade.

*Id.* at 489. It can, therefore, be gleaned from this decision that a difference in market price and a difference in the item's color do not automatically determine classification. Thus, whether or not the "bleached barytes" are white in appearance and more costly, is not decisive in classification under 472.12.

There can be two grades of an article which differ only by the presence of impurities in one of the grades. It these impurities are no part of the article itself, and, can be removed without changing the character of the article per se, even if slightly adding to its value, this is not advancing the article in value or condition. *Id.* at 490–491. If this were not the case, then the term "not advanced in value or condition" would mean only an article "in its native state, in the bowels of the earth, in the heart of the tree, or in its other original place of discovery, wherefore no article the subject of commerce could respond to that definition." *Hampton, Jr., & Co.* v. *United States*, 6 Ct. Cust. App. 392, 395, T.D. 35926 (1915).[5]

---

[5] Imported molybdenite, freed from its natural rock or gangue formation by a process of crushing and flotation, was not itself crushed. The court held that this was a process necessary to produce the article from its native condition into its imported condition without affecting its per se character and did not constitute an advancement in value or condition.

Where, after processing, the imported material contains a greater percentage of a substance than did the ore when taken from the ground, this cannot be considered advancing the material in value or condition. *C.J. Tower & Sons* v. *United States*, 26 Cust. Ct. 48, C.D. 1297 (1951). In that case zirconium ore (zirkite), containing 75% zirconium oxide and the gangue comprising the other 25%, was processed to increase the zirconium oxide from 75% to 95% concentration. Removal of the undesirable constituents was accomplished by adding coke and iron borings to the zirconium ore, fusing the mixture, and then cooling it to remove the unwanted material. The court held that the imported merchandise "still consists of zirconium oxide, although in a more concentrated form. The process through which it has been placed has not advanced the ore in value from the condition as it is found in the earth. It has not acquired a new name or a new use." *Id.* at 54. Defendant, relying on *Tower*, claims that the acid leaching process produces a barium sulfate product with a new name and new use. Nevertheless, as mentioned, technical treatises recognize that barite may be bleached (thereby acquiring the name "Bleached barytes") and may be used for x-ray preparation. Therefore, it does not appear that a new name has been acquired or a new use has been developed.

The affidavits of George Cable and John Sloan, submitted by defendant, do not contradict what has been cited from other scientific authorities. Mr. Cable stated that Pfizer, the company that employs him as a Technical Service Manager, produces bleached barytes called "No. 1 Barytes." These white barytes can be produced from naturally white barium sulfate ore, or by acid leaching barium sulfate ore which is darker in color. He further states that natural ground barite is used in applications where whiteness is not required. Mr. Cable's affidavit does nothing more than reinforce the principle that an article in nature may have different grades depending upon color. *See United States* v. *Sheldon, supra.*

John P. Sloan, Jr. is Manager of Quality Assurance at Magocbar, a producer of oil well drilling fluids materials. In his opinion, the term natural ground barite (barytes) would not normally be used to describe natural barium sulfate which has been so advanced in purity to be considered a medical grade. Nevertheless, how a product is usually offered in the trade does not prevent it being offered in less usual forms. *International Selling Corp.* v. *United States*, 62 Cust. Ct. 23, 27, C.D. 3669, 294 F. Supp. 642, 645 (1969). Mr. Sloan's exposure to barite has been mainly in the oil well drilling industry where the baryte application is of a 75%–92% barium sulfate content. References indicate that at least 90% of ground barite is used as a weighting agent in the oil well drilling industry now, *see Summaries, supra*, at 172, even though this use is not the only one recognized.

While the Tariff Schedules distinguish crude barium sulfate from ground barium sulfate, Congress did not provide for barium sulfate to be separately classified according to color, purity or ultimate use.

Whether or not "natural ground barite" is of a medical grade and could be used for its ultimate purpose is not dispositive. The fact that an imported article is fit for its present use might be decisive in some cases, but is not a universal or safe test. *United States* v. *Sheldon & Co.*, 2 Ct. Cust. App. 485, 494 (1912) (citing *Littlejohn* v. *United States*, 119 Fed. Rep. 483, 484 (1902)). *See also International Selling Corp.* v. *United States*, 62 Cust. Ct. at 27, 294 F. Supp at 645 (absent a restriction in the Tariff Schedule to the contrary, an article ready for its final and ultimate use is still classified under the *eo nomine* designation.)

Plaintiff has submitted two affidavits, one from Irwin Rosenblum, a chemical engineer formerly employed by E–Z–EM, and one from Joseph Riina, a vice president at E–Z–EM. These affidavits indicate that the merchandise in issue is commercially sold and known as natural ground barite. Defendant has claimed in the alternative that a triable issue of fact has been raised by the conflicting statements of the affiants. However, defendant's affidavits do not dispute that the barytes have not undergone a chemical reaction. What is in issue is the definition of the tariff term and this is a question of law. *Daw Industries, Inc.* v. *United States*, 714 F.2d 1140, 1141 (Fed. Cir. 1983).

Therefore, it must be concluded that plaintiff's imported barium sulfate is natural ground barite properly classifiable under item 472.12. This is an *eo nomine* provision without any stated limitation as to industrial or medical use. The acid leaching performed on the barytes does not cause a new product to be manufactured but rather a more pure grade of ground barite is achieved. This grade of barytes is not so advanced in value or condition as to remove it from the classification of natural ground barite. As defendant admits, the acid leaching does not act on the barytes itself but rather acts on the impurities. The cited authorities reveal that a form of cleansing acting to remove impurities which does not change the article itself, except perhaps to make it more pure or concentrated, does not advance the article in value or condition.

Therefore, in light of the above, plaintiff's motion for summary judgment classifying the imported merchandise as barium sulfate, natural, ground, under item 472.12, TSUS, is granted and defendant's cross-motion is denied.

Judgment will be entered accordingly. So ORDERED.