58 CCPA

**NATIONAL POLYCHEMICALS, INC.,**
Appellant,

v.

**The UNITED STATES, Appellee,**

**J. J. Gavin & Co., Inc., A/C A & S Corp., Party-In-Interest.**

**Customs Appeal No. 5361.**

United States Court of Customs and Patent Appeals.

Dec. 3, 1970.

———◆———

Richard P. Crowley, Boston, Mass., attorney of record, for appellant.

William D. Ruckelshaus, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Glenn E. Harris, New York City, for the United States.

Joseph E. Donohue, for party-in-interest.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and McMANUS, Judge, Northern District of Iowa, sitting by designation.

RICH, Judge.

This appeal is from a judgment of the United States Customs Court, First Division, 62 Cust.Ct. 453, C.D. 3801 (1969), overruling the protest of appellant, an American manufacturer, to the classification of dinitrosopentamethylenetetramine (DNPT) as a compound "containing a triazine ring" within the meaning of Item 425.10 of the Tariff Schedules of the United States (TSUS). Appellant Polychemicals claims that DNPT should be classified under the "basket provision" for "other" nitrogenous compounds, TSUS Item 425.52. We affirm.

DNPT is a nitrogenous compound used commercially as a blowing agent, or "gas generator," to expand rubber or plastics into sponge or foam forms. Its chemical structure is not in dispute, it being conceded by all parties that it is as follows:

[A3220]

It will be seen to contain two fused rings of alternating carbon and nitrogen atoms, each ring consisting of three carbon atoms, one of which is shared by both rings, and three nitrogen atoms, two of which are shared by both rings. It is to be particularly noted, since it is highly relevant to the arguments on this appeal, that each atom in each ring is connected to the adjoining atoms in the ring by *single* bonds.

What is disputed is whether the rings contained in DNPT[1] are "triazine"

---

1. Polychemicals has not attempted to argue that DNPT does not come under TSUS Item 425.10 because that item calls for *a* (triazine) ring whereas DNPT contains two rings.

rings. Polychemicals contends that they are not because they do not contain three *double* bonds in each ring, which it contends is a necessary condition for a ring containing three carbon and three nitrogen atoms to be correctly denominated a triazine ring. The Government and Gavin, the party-in-interest, contend that all rings consisting of three carbon atoms and three nitrogen atoms are triazine rings regardless of whether there are three, two, one, or no double bonds connecting the ring atoms.

Before discussing these contentions, however, it will aid understanding to define a number of overlapping terms frequently used in the record, briefs, and the opinion below. The rings in DNPT are simultaneously saturated (or fully saturated), hydrogenated (or fully hydrogenated), reduced (or fully reduced), and nonaromatic, all because they are internally connected entirely by single bonds. Similarly, rings containing three double bonds, of the sort which Polychemicals contends are uniquely entitled to the appellation "triazine," are unsaturated, non-hydrogenated, unreduced, and aromatic. In the process of hydrogenation, double bonds are replaced with single bonds, the addition of two peripheral hydrogen atoms making up for the loss of each double bond.

The court below adopted the Government's and Gavin's definition of a triazine ring as "any six-membered heterocyclic ring system containing, as does the compound at bar, three nitrogen and three carbon atoms," holding specifically that "the state of hydrogenation of the ring system is not relevant to its identification or classification as a triazine ring." In its summary, the court purports to base its conclusion (1) solely on "the record," which contained conflicting statements from various eminently qualified experts, but it is clear from its opinion that it also gave weight (2) to legislative history in the form of a footnote in the Fifth Supplemental Report, Tariff Classification Study, which flatly states that "item 425.10 covers a variety of chemicals containing a triazine ring

such as dinitrosopentamethylenetetramine," and (3) to a rule of statutory construction favoring a finding that the Tariff Classification Act of 1962 applied the same duty to DNPT as did the Tariff Act of 1930.

We will consider these three bases for the lower court's decision sequentially.

### (1) *Experts' Testimony*

The witnesses put forward by all three litigants were unusually well qualified as experts. One of Polychemicals' witnesses was the Director of the Nomenclature Section of the Chemical Abstract Service of the American Chemical Society, while the other was a chemical consultant to industry who had held a series of high-level research and development positions in the chemical field and who had over 120 United States patents to his credit. The Government's witness was the author of one of the two extended published treatments of triazine technology, and Gavin's witness was a college chemistry professor.

Polychemicals argues that the testimony of the Director of the Nomenclature Section of the Chemical Abstract Service, Dr. Kurt L. Loening, "should be given great evidentiary weight in matters of nomenclature," first, because the United States Tariff Commission's Tariff Classification Study (November 15, 1960) states, at page 2 of the "Explanatory and Background Materials" on Schedule 4, Chemicals and Related Products, that, "In proposed schedule 4, wherever possible the products have been described in technical, chemical terminology," and second, because the same study, at page 59, as part of the "Explanatory Notes" to Subpart D, Organic Chemical Compounds (in which subpart both items here contended for are found), of Part 2, Schedule 4, specifically mentions *"Chemical Abstracts, a publication of the American Chemical Society"* as an authority for the arrangement of chemical compounds in the Tariff Schedules.

The first point is well taken; certainly Dr. Loening's credentials established him as an authority on "technical, chem-

ical terminology." However, the reference to Chemical Abstracts does not give that publication quite the authority in matters of detail for which Polychemicals contends. The headnote to Subpart D, Part 2, Schedule 4, reads in pertinent part, now as when the Tariff Classification Study was published:

Organic compounds in this subpart are arranged according to functional group. Any organic compound which is described in more than one functional group is classifiable in the first group in which it is described.

Expanding on this, the "Explanatory Notes" to the subpart in question state, at page 59 of the Tariff Classification Study, that:

The existing tariff act provides for many organic chemical compounds of "nonbenzenoid" structure classified by functional groups such as acids, alcohols, and esters. * * *

* * * * * *

Because many organic chemical compounds are embraced within two or more different functional groups, these groups are arranged so that a compound described in two or more groups would be classifiable in the first group in which it is described. *The order of precedence of these functional groups* is generally that used in naming and indexing chemical compounds by *Chemical Abstracts*, a publication of the American Chemical Society. [Emphasis ours.]

Thus, it was the order of precedence of the functional groups in nonbenzenoid organic compounds which was adopted ("generally") from *Chemical Abstracts*, not the names of individual compounds or compound components, and the functional group to which DNPT belongs (*nitrogenous compounds*) is not in issue between the parties.

However, there is no doubt that *Chemical Abstracts* is "*an* authoritative reference," Aldrich Chemical Co. v. United States, 62 Cust.Ct. 333, 339, C.D. 3758 (1969) (emphasis ours), in determining "technical, chemical terminology," and Dr. Loening, who "authored most of * * * [the *Chemical Abstracts* rules for systematic nomenclature of chemical compounds] with the help of colleagues, of course" (R. 21), was entitled to respectful attention when he replied in the negative to Polychemicals' counsel's question:

Q. Merely because a ring compound contains three carbons, three carbon atoms, and three nitrogen atoms, does that chemical compound then contain a triazine ring in accordance with the official Chemical Abstract System of nomenclature? [R. 33.]

Similarly, the testimony given in the following exchange between counsel for Polychemicals and its other witness, Mr. ter Horst, an industrial chemist with impressive credentials, was entitled to respectful attention: [2]

Q. In your opinion and based upon your experience and knowledge, what

---

2. However, it should be noted that it was Mr. ter Horst's qualifications as a chemist rather than his qualifications as one familiar with industrial terminology which entitled his words to respect. We have already quoted the sentence "In proposed schedule 4, wherever possible the products have been described in technical, chemical terminology" from page 2 of the "Explanatory and Background Materials" on Schedule 4 in the United States Tariff Commission's Tariff Classification Study (November 15, 1960). The paragraph from which that sentence was taken continues, "The use of such terminology imparts greater certainty to the tariff descriptions. Persons trading in chemicals are generally familiar with technical descriptions no matter how they may otherwise describe their goods." From the above it is clear that Congress intended to classify chemicals by their generally accepted technical nomenclature, in contradistinction to the usual rule that "tariff terms are not to be classified according to their scientific meaning, where that meaning differs from the common or commercial understanding of the term." United States v. Sandoz Chemical Works, Inc., 46 CCPA 115, 118, C.A.D. 711 (1959).

are the primary and essential characteristics of a chemical compound which contains a triazine ring, in accordance with industry practice? A. It has to be a six-membered ring containing three nitrogen atoms, three carbon atoms, and three double bonds. The nitrogen atoms do not have to be symmetrical. They can be 1, 3, 5 or 1, 2, 4, or 1, 2, 5. [R. 56.]

But the Government and the party-in-interest did not rest at the conclusion of Polychemicals' case. The Government called Dr. Edward Modest, author of "a chapter of approximately 100 pages covering all phases and areas of triazine chemistry" (R. 65–66) in Volume 7 of a series entitled *Heterocyclic Compounds*, edited by Dr. Robert Elderfield. Dr. Modest testified that there were only two systematic treatments of triazine chemistry in recent years, his and "a book that was written by Smolin and Rapoport, published in 1959 by Interscience" (R. 66), and that both in his chapter and in Smolin and Rapoport's book compounds containing unsaturated, partially saturated, *and fully saturated* rings were all treated as compounds containing triazine rings. Furthermore, Dr. Modest testified that *Chemical Abstracts* itself had adopted, for a compound he had first disclosed and for a series of related compounds, nomenclature containing the word "triazine" although the compounds contained a partially reduced ring consisting of three nitrogen atoms and three carbon atoms linked by four single bonds and only two double bonds. (R. 74–75.) When it came Gavin's turn to offer testimony, the party-in-interest called Dr. Francis E. Condon, a professor of chemistry at the City College of New York, who corroborated Dr. Modest's testimony generally and testified specifically that the ring in DNPT "Is * * * a triazine ring as the term is used among chemists" even though it is in the saturated form. (R. 96–97.)

We are an appellate court, not a trier of facts, and our review of a determination of fact by the Customs Court is limited to deciding whether +' '~ is evidence to support its determination and whether its determination is clearly contrary to the weight of the evidence. United States v. F. W. Myers & Co., 45 CCPA 48, 52, C.A.D. 671 (1958). In this case there was direct conflict in "expert" testimony directed to the fundamental fact in issue, and the Customs Court's resolution of that conflict cannot be said to be unsupported by evidence or clearly contrary to the weight of the evidence.

### (2) *Legislative "History"*

The second basis of the lower court's decision was the statement on page 25 of the United States Tariff Commission's Fifth Supplemental Report, Tariff Classification Study, in an "Explanation" accompanying a revision of the items covering nitrogenous compounds, that "item 425.10 covers a variety of chemicals containing a triazine ring such as dinitrosopentamethylenetetramine" (DNPT), which statement the court accepted as part 'of the "legislative history of item 425.10 of the Tariff Schedules of the United States * * *." Polychemicals contends that the statement in the Supplemental Report should be given little or no weight for two reasons: First, "since there was no change in duty involved in the classification of DNPT at that time [because DNPT had been being dutied at the same rate under a paragraph of the Tariff Act of 1930 imposing the same rate as Item 425.10 by virtue of an administrative ruling of the Bureau of Customs], no investigation or hearing was held or required by the Tariff Commission and the Tariff Commission record is accordingly devoid of comments or basis for the footnote referring to the classification of DNPT * * *." Second, "Congress, in fact, never had before it the classification of DNPT" because the Fifth Supplemental Report was published after the passage of the Tariff Classification Act of 1962, and it therefore cannot be used as "legislative history" of the act.

These points are, we think, well taken. In view of the fact that the Tariff Commission never publicly considered the

classification of DNPT, the statement in question should be accorded less weight than if the classification of DNPT had been publicly debated. Similarly, it appears logically true that the fact of the Fifth Supplemental Report's post-passage publication detracts from its force as an indicator of congressional intent at the time of the passage of the Tariff Classification Act. However, as Polychemicals is forced to concede, we have previously accepted such a publication as part of the legislative history of this act, Rifkin Textile Corp. v. United States, 54 CCPA 138, 141, C.A.D. 925 (1967), and we are not disposed to overrule that decision now. We do not wish to allow a too-zealous regard for the sequence of events to deprive us of the aid in interpreting statutes of such authoritative, if belated, exegeses published by the very agency which was responsible for the drafting of the statute.

Nevertheless, conceding that both objections raised by Polychemicals have some merit, we disagree with appellant's contention that "any congressional intent implied from the record should not be given any significant evidentiary weight." Furthermore, we are not persuaded that the court below in fact gave it undue evidentiary weight.

### (3) *Continuance of Duty Rate*

The third and final basis of the lower court's decision was "the continuance by Congress of the same rate of duty * * in the aforesaid item [Item 425.10] of the tariff schedules as had been applied to chemical compounds [i. e., to DNPT] under paragraph 5 of the tariff act prior to the adoption of the tariff schedules," which the court denominated "a significant factor in our present determination * * *." Polychemicals' attack on this basis of the lower court's decision is two-fold.

First, it contends that "the giving of significant weight to maintenance of the same duty is reversible error" because the United States Tariff Commission's Tariff Classification Study (November 15, 1960) states, at page 59, as a part of the "Explanatory Notes" to Subpart D, Organic Chemical Compounds, of Part 2, Schedule 4, that:

> Most of the existing provisions for organic compounds have been assimilated into part 2D without change in rate of duty. Any new "basket" class made up of compounds in different existing overlapping "baskets" at different rates of duty is given the rate which has been applied to most of the imports in recent years. This consolidation has resulted in some changes in the rates of duty. However, such changes, which are incidental to desirable clarification, *are believed to be insignificant*. [Emphasis in quotation at page 36 of Polychemicals' brief.]

Polychemicals' argument, which seems to be based on the use of the word "insignificant" in the above quotation, in contrast to the use of the word "significant" in the sentence from the opinion of the lower court which is under attack, is that "there is an absence of any declaration that continuation of the same duty should be or is a *significant* factor in the classification" (emphasis in original) and that therefore it is error to hold that continuance of the same rate of duty as previously applied is a significant factor in arriving at classification under the new statute.

We think this argument is without merit. What the Tariff Commission clearly meant by the quoted sentence was that what few changes in rates were wrought by the new "basket" classes were commercially insignificant. These sentences were plainly meant to allay any possible congressional fears that the new "basket" classes would alter radically then-existing tariff treatment of imported chemical compounds. They cannot be contorted into a congressional direction that a judicial determination that a particular classification under the new statute would or would not continue the rate previously applied should be an insignifi-

cant factor in determining under which TSUS item imported goods should be classified.

As far as the logic of the lower court's action is concerned, we note that the sentence attacked by appellant on this branch of its case follows the sentence "These changes made in the provisions of Part 2D with respect to nitrogenous compounds will, to the extent practicable, continue the existing rate treatment," quoted from page 25 of the United States Tariff Commission's Fifth Supplemental Report, Tariff Classification Study (May 16, 1963). Both this sentence and the first sentence in the above-quoted passage from the original Tariff Classification Study make it quite clear that the intent of the drafters of the Tariff Schedules was that the tariff rates on most nitrogenous compounds prevailing before the promulgation of the new Tariff Schedules would continue to prevail after their promulgation. Accordingly, a finding of rate continuance in this subsection *may* be "a significant factor" in classifying the imported goods—although far from a dispositive factor.

The second prong of Polychemicals' attack on the third basis of the decision below is that, "Assuming arguendo that the maintenance of the correct duty [same duty?] is a significant factor" the administrative classification by the Bureau of Customs which placed DNPT in a category taxed at the same rate as is now levied by Item 425.10 was wrong, and a correct interpretation of the Tariff Act of 1930 would place DNPT in a category taxed at the same rate as is now levied by Item 425.52, the item under which Polychemicals contends DNPT should now be dutied. This argument fails because it is the *fact* of the previous classification which is "significant," not whether the previous classification was correct.

Finding no error in the judgment of the lower court, it is affirmed.

Affirmed.